LAKE DRUMMOND CANAL AND WATER COMPANY v.
T. M. BURNHAM et al.

(Filed 4 March, 1908).

1. Water and Water Courses—Upper and Lower Proprietor—
   Rights—Temporary Structure.

   When an upper proprietor of lands constructs and maintains for his own use and advantage an artificial waterway or structure affecting the flow of water, without invading the rights of the lower proprietor, for a temporary purpose or a specific purpose which he may at any time abandon, the upper proprietor comes under no obligation to maintain the structure, though the incidental effect has been to confer a benefit on the lower tenant.

2. Same—Drainage—Overflow Waters—Natural Drainage—Lower
   Tenant—Upper Tenant—Obstruction—Right to Remove Ob-
   struction—Damages.

   Plaintiff had the right of possessing and operating Dismal
   Swamp Canal, and of constructing a cross canal to draw the
   water of Lake Drummond into the main canal in aid of naviga-
   tion. It ascertained that this water was no longer required
   for such purpose. In widening and deepening its main canal
   it closed the mouth of the cross canal, causing the overflow
   waters of the lake, which this canal had carried for forty years
   or more, to go to some extent onto defendants' land, causing
   injury thereto: *Held*, the defendants have no right of action for
   such injury when it appears that this was the natural direction
   of the waters of the lake, and the lands of defendants did not
   naturally drain into the cross canal; nor had the defendants ac-
   quired any right or privilege of such drainage, by user or other-
   wise.

3. Same—Lower Proprietor—Incidental Easement—Reciprocal Ease-
   ment—Limitation of Action—Adverse Possession.

   When the upper proprietor in the exercise of his right deter-
   mined to abandon an artificial waterway or structure, which he
   had maintained on his own premises without invading the rights
   of the lower proprietor, but from which the lower proprietor
   had been incidentally benefited, the lower proprietor can acquire
   no right of easement in the continuance of the waterway or
   structure by lapse of time, there being no reciprocal easement
   in his favor to support the plea of adverse possession, and there-
   fore nothing upon which a grant can be presumed.

CIVIL ACTION, tried before *W. R. Allen, J.,* and a jury, at
Special Term, 1907, of the Superior Court of CAMDEN
County.

The action was instituted by plaintiff to restrain a number
of defendants from alleged wrongful injury to plaintiff's
canal, and there was evidence offered tending to show: "The
plaintiff owns the canal formerly known as the 'Dismal
Swamp Canal,' extending from the Elizabeth River, in Vir-
ginia, to the Pasquotank River, in North Carolina, and it is
a highway of public travel for steamboats, barges, tugs and
other craft plying between the waters of North Carolina and
the waters of Virginia. There is another canal, called the
'Cross Canal,' which runs at right angles from a point about

thirty feet from the other canal westwardly into Gates
County, about twenty miles. The defendants own, in sever-
alty, valuable lands which lie from three·to seven miles below
the said 'Cross Canal,' none of which drain in or towards the
'Cross Canal.' In 1897 the plaintiff company enlarged and
deepened the 'Dismal Swamp Canal,' and, for the protection
and improvement of the same, thus enlarged, the plaintiff
widened and raised the banks of that canal, and the banks, so
raised and widened, remained as they were from 1897 to
June, 1906. In June, 1906, the defendants, claiming to be
injured by the raising and broadening of the said banks at
the 'Cross Canal,' cut through the same, between the head of
the 'Cross Canal' and the 'Dismal Swamp Canal,' a distance
of thirty feet or more, and turned the water from the said
'Cross Canal,' and the swamps which drain into it, into the
'Dismal Swamp Canal,' and, as a result of such cutting,
turned into it sand, mud and debris to such an extent as, after
twelve hours, to so fill it that one could walk out into the
canal forty-three feet from its banks, dry shod, for a distance
of about seventy-two feet along the banks. The plaintiff
filled up the cut which had been made, and dredged out the
said filling, but the defendants threatened at once to open the
same again, and were about to do so when enjoined by the
court."

Defendants answered, making denial of some of the mate-
rial allegations of plaintiff, and, by way of counterclaim, made
further answer, as follows:

"1. That they are the owners and in possession of large
quantities of land and growing crops lying on what is known
as 'Corapeake' or 'Cross Canal,' which empties into the 'Dis-
mal Swamp Canal' about five miles northwest of the town of
South Mills, in Camden County.

"2. That said 'Cross Canal' is twelve miles long and be-
tween ten and twenty feet wide, and is the main and only
drain for their said lands, and has been for the past seventy-

five or one hundred years, long before the plaintiff herein acquired any interest whatever in the 'Dismal Swamp Canal.'

"3. That during the latter part of March, or first of April, 1906, the Lake Drummond Canal and Water Company, by its agents and servants, went to the mouth of said 'Cross Canal' and, with a steam shovel, did willfully and unlawfully fill up the mouth of said 'Cross Canal,' thereby stopping all flow through said 'Cross Canal' and ponding the water on the lands and crops of the defendants herein, utterly and entirely destroying the crops of the defendants and greatly damaging the lands herein mentioned, paying nothing to the defendants by way of condemnation or otherwise.

"4. That defendants herein were preparing to reopen said 'Cross Canal,' when the general superintendent of the plaintiff, one J. B. Baxter, through the captain of the plaintiff's dredge, requested that they not reopen said 'Cross Canal'; that he would have his company do so immediately and place a culvert there; upon which promise defendants refrained from opening said 'Cross Canal,' and were later served with a restraining order forbidding them from reopening it at all.

"5. That plaintiff has never made any attempt whatever to put in said culvert or otherwise open said 'Cross Canal,' and that the lands and crops of the defendants are and have been for many weeks past entirely covered with water, because of the damming of said 'Cross Canal' by the plaintiff herein.

"6. That by reason of such unlawful damming of 'Cross Canal' by the plaintiff, and the consequent ponding of water on defendants' lands, the crops of the defendants have been injured to the extent of $15,000; that the lands have already been greatly damaged, and that, if said 'Cross Canal' is not opened immediately, the ponded water on the defendants' lands will cause said lands to sour and to become absolutely worthless for any use whatever, which lands, before the ponding of the water thereon by the plaintiff, as herein set out, were worth not less than $37,000..

"7. That the cause of action set out in this answer in the defendants' cross bill arose prior to the bringing of this action."

Plaintiff made formal reply, denying material allegations of the counterclaim. Various issues were submitted as determinative of the rights of the parties and as to the amount of damages suffered by defendants. The court set aside a verdict for defendants on the issue as to damages, and on the other issues gave judgment restraining defendants from further interference with plaintiff's canal, and restraining plaintiff from "maintaining the banks of its canal at the point between said 'Cross Canal' and the canal of plaintiff at a greater height than in 1897, before same was increased." From this judgment plaintiff, having duly excepted, appealed.

*Pruden & Pruden* and *Aydlett & Ehringhaus* for plaintiff. *Ward & Grimes* and *W. A. Worth* for defendants.

HOKE, J., after stating the case: The fifth issue and the response of the jury thereto are as follows:

"5. Have the defendants, or either of them, the right and easement to drain into the canal of plaintiff or into the 'Cross Canal'?" Answer: "No."

There is no fact or finding of the jury which in any way changes or impairs the force and effect of this verdict, and the Court is of opinion that it is thereby conclusively determined that the defendants are not entitled to the relief awarded them, and to this extent the judgment of the court below must be reversed. The company known as the Dismal Swamp Canal Company was chartered by act of the Legislature at the session of 1790 (Revised Statutes of North Carolina, Vol. II, p. 217). By section 12 of this act it was provided: "And whereas it is represented that the waters of the lake in the Dismal Swamp, commonly called 'Drummond Pond,' may be useful for a supply of water to the said canal: Be it enacted, that the said lake, so far as the water thereof shall be neces-

sary for the purpose aforesaid, shall be and is hereby vested in the proprietors of said canal; and it shall and may be lawful for the said president and directors, or a majority of them, to open, if they shall find it expedient, a cross canal from the lake to the principal canal, for the purpose of drawing from thence a supply of water; and for executing this work they shall have the same powers which they are authorized to exercise in opening the principal canal." It was, no doubt, under and by virtue of this section, and for the purposes therein indicated, that the 'Cross Canal,' referred to in the present proceedings, was constructed. The present owners of the main canal, having ascertained or concluded that the waters of the lake, heretofore conveyed by the 'Cross Canal,' are no longer required for purposes of navigation, determined to abandon it, and in widening and deepening the main canal they have thrown the sand and mud produced by their additional excavation on the bank, and so as to stop up the mouth of the 'Cross Canal' and obstruct the flow of water therein; the result being that the waters of the lake, which by this canal have heretofore been drained into the main canal, now flow in their natural direction towards the river, and a portion of them affect the lands of defendants, causing the damage complained of. While, however, the evidence of defendants tends to show that these lands have been damaged by stopping up this 'Cross Canal,' and the verdict of the jury seems to have established it, it is an injury for which the law cannot afford redress.

It will be noticed that the canal is an artificial drain, made by the predecessors of plaintiff for their own convenience and advantage, and in the exercise of a right of property and an easement conferred upon them by the statute for a specific purpose. The lands of the defendants do not abut upon this "Cross Canal," and the verdict finds that the defendants had no right or privilege of drainage into either one of the canals. On the contrary, the testimony shows that they are situated

several miles from the "Cross Canal," and their natural drainage is in an entirely different direction, towards the Pasquotank River; and, while this "Cross Canal" has existed for many years, forty or more, and has operated to some extent to protect the lands of defendants by diverting the overflow waters of the lake from their natural direction into the main canal, on the facts presented here there is no principle that requires that the plaintiff should keep this "Cross Canal" open for defendants' benefit, or that its conduct concerning it should subject it to an action.    As to defendants, it is *damnum absque injuria.*    If it should be conceded that defendants, as owners of lands which lie in the general direction that the overflow waters of the lake naturally take towards the river, are lower proprietors in reference to such waters—and this is the strongest position that can be taken in their behalf—their right to relief on this verdict cannot be sustained. The doctrine is—certainly it is the position supported by the great weight of authority—that where the proprietor of an upper tenement constructs and maintains on his own premises, and for his own convenience and advantage, an artificial waterway, or any artificial structure affecting the flow of water, and such structure invades no right of the lower proprietor and gives indication that it is for a temporary purpose, or a specific purpose which may at any time be abandoned, the upper proprietor comes under no obligation to maintain the structure and the conditions produced by it from lapse of time, though the incidental effect has been to confer a benefit on the lower tenant.    Nor in such case does the lower proprietor acquire any right which rests only on prescription. An easement arising in that way can only be established by reason of adverse possession or continuous invasion of another's rights.    Gould on Waters (3d Ed.), secs. 161, 340; Farnham on Waters and Water Rights, Vol. III, pp. 2400, 2435, 2436, 2437; *Arkwright v. Gell,* 5 M. & W., 202;

*Mason v. Railway,* L. R., 2 B., Vol. VI, pp. 577, 586; *Greavdox v. Heynard,* 8 Exch., 290.

And the decisions of our own Court are to like effect.  *Felton v. Simpson,* 33 N. C., 84; *Mebane v. Patrick,* 46 N. C., 23.  In *Felton v. Simpson* the plaintiff owned land on a stream below defendant's dam, and the incidental effect of this dam was to protect the plaintiff's land from "sudden inundations in heavy falls of rain, by ponding the water until it could be drained off by ditches."  The plaintiff had been ·in the uninterrupted enjoyment of the benefit of this protection for more than twenty years, when defendant cut through the dam to relieve it from a large body of water collected from recent rains, causing plaintiff's land to overflow and injure the crops.  Recovery was denied, and it was held: "In order to raise the presumption of the grant of an easement, two things are necessary: There must be a thing capable of being granted, and there must be an adverse possession or assertion of right, so as to expose the party to an action, unless he had a grant."  And *Pearson, J.,* delivering the opinion of the Court, said: "When one continues in the uninterrupted possession of land for thirty years, or enjoys the use of a franchise for twenty years, a grant is presumed.  So, if one erects a dam and ponds back water upon the land of another, and is allowed to keep it there for twenty years, a grant of the easement or privilege of doing so is presumed; and so in many similar cases.  But, to make this doctrine applicable, two things are necessary: There must be a thing capable of being granted, and there must be an adverse possession or assertion of right, so as to expose the party to an action, unless he had a grant; for it is the fact of his being thus exposed to an action, and the neglect of the opposite party to bring suit, that is seized upon as the ground for presuming a grant in favor of long possession and enjoyment, upon the idea that this adverse state of things would not have been submitted to if there had not been a grant.  Where one erects a dam on his

own land, and another who owns lands below incidentally de-
rives a benefit by availing himself of the protection which the
dam enables him by means of ditches to give to his land, which
is our case, neither of these essentials for presuming a grant
has an existence."

Speaking to this same question, in *Mason v. Railway, supra,*
*Cockburn, C. J.,* concurring, said: "It is the essence of an
easement (to divert a stream by an artificial way) that it
exists for the benefit of a dominant tenement alone. Being
in its very nature a right created for the benefit of a dominant
owner, its exercise by him cannot operate to create a new
right for the benefit of a servient owner. Like any other
right, its exercise may be discontinued if it becomes onerous
or ceases to be beneficial to the party entitled." The position
is discussed at some length, and very satisfactorily, in Farn-
ham on Waters and Water Rights, *supra,* under the doctrine
of reciprocal easements; and the citation, after stating differ-
ent methods by which such reciprocal easements may be estab-
lished, continues as follows: "Having established the fact
that there may be reciprocal easements existing in favor of
adjoining property owners, the question arises as to how far
such a condition may be established by prescription. Put in
a concrete form, the question may be propounded thus: If the
owner of a mill on a stream acquires, by prescription, the right
to flow the water back upon the land of an upper proprietor,
does the latter acquire a reciprocal right to have the flowage
maintained, and can he compel the mill owner to maintain
his dam for that purpose? To the question in this form the
answer seems plain that there is no such reciprocal right.
The equitable doctrine of prescription depends upon the pre-
sumption of a grant, and equity will only presume a grant
when certain well-defined conditions are present, one of which
is an adverse claim to the property out of which the right is
alleged to have arisen. In the case supposed, there is no ad-
verse claim on the part of the owner of the submerged land

to have the dam maintained, and, therefore, nothing upon which a grant can be presumed." And, further: "The doctrine applicable in case of the damming of the water back on the upper property is equally applicable in case of drainage over lower property. In *Greatrex v. Hayward* the Court held that the flow of water from a drain made for the purpose of agriculture, for a period of twenty years, does not give a right to the lower proprietor to its continued flow, so as to prevent the alteration of the drain for the improvement of the upper estate. This is put upon the ground that the character of the water course is temporary merely, depending upon the mode which the upper owner had adopted for draining his land; also, that the user by the lower owner had not been adverse." The author then proceeds to criticise a decision of the Minnesota Court (*Kray v. Muggli,* 77 Minn., 231), which asserts a position contrary to that upheld in the text, and also certain expressions of the Chancellor to same effect in *Belknap v. Trimble,* 3 Paige, 577, and declares that the Minnesota decision, and some others of like tendency, are not in accord with the weight of authority.

In what is here said we do not intend to question the decision of *Belknap v. Trimble,* and other cases of like import, to the effect that, where an upper proprietor, by an artificial structure on his own premises, has caused a change of a stream in which they both had riparian rights from the original to a new channel, under circumstances which give indication that the change is to be a permanent one, and the lower proprietor, accepting the change, has built mills and made improvements dependent on the flow of the stream in its new course, the enjoyment and user of these improvements will, under certain circumstances, be protected by injunctive relief or other efficient action of the courts. These decisions can well be upheld under the doctrines of dedication and estoppel, as in *Delaney v. Boston,* 2 Harr. (Del.), 489; Farnham, pp. 2437, 2438. But this principle has no application here. The former pro-

prietors of the "Dismal Swamp Canal," acting under a char-
ter from the State, in the exercise of proprietary rights and
privileges therein granted, constructed this "Cross Canal,"
an artificial way, as a feeder to the main canal and as an aid
to navigation.   And the present owners, having concluded
that this additional supply of water is no longer required for
the purpose, and that its continued flow into the main canal,
in its present condition, will cause damage to their property
and act as a hindrance to their enterprise, have determined to
abandon the "Cross Canal" and obstruct its further flow.   It
was originally constructed for the advantage and convenience
of plaintiff's predecessors, and for a definite purpose, and
defendants have acquired no right to enforce its maintenance
for their protection.

The exact case is stated by Gould on Waters, *supra,* as fol-
lows: "When a canal company was authorized, but not re-
quired, by statute to divert the waters of a stream, which they
did for a period of forty years, it was held that riparian pro-
prietors below on the stream had no right to insist that the
diversion should be continued for their benefit."

The Court, being of the opinion that, on the facts presented,
defendants are not entitled to any redress against the plaintiff,
has deemed it best to place the decision on that ground, as it
may serve to end the matter at issue.   But we must not be
understood as deciding that, if it were otherwise, defendants
would be entitled to the injunctive relief awarded them by the
judgment below.   It appears that plaintiff is engaged in
carrying on an enterprise for the benefit of the public, under
a *quasi* public charter, and it is ordinarily true that, if an
adjacent property owner suffers injury in his proprietary
rights by reason of such an undertaking, he is restricted to an
action for damages, or some statutory method of redress.

There is error in the judgment below, in so far as it en-
joins plaintiff from obstructing the flow of the "Cross Canal,"
and to that extent the judgment below is

Reversed.