[No. 24082. Department One. January 24, 1933.]

DRAINAGE DISTRICT NO. 2 OF SNOHOMISH COUNTY *et al.,* *Respondents and Cross-appellants,* v. THE CITY OF EVERETT, *Appellant.*[1]

[1]Reported in 18 P. (2d) 53.

472

*J. Y. Kennedy* and *S. J. Brooks,* for appellant.

*Joseph H. Smith* and *Newton & Newton,* for respondents and cross-appellants.

MILLARD, J.—A dam, owned and maintained on its own property by the city of Everett for the purpose of impounding the waters of Woods creek for use of the city, was destroyed by the city. Plaintiff, alleging its drainage system was damaged by sediment and silt deposited therein by the abandoned waters of the creek, brought an action to recover therefor. The trial of that cause resulted in verdict in favor of the plaintiff. From the judgment entered on the verdict, the defendant has appealed.

By a second cause of action, the plaintiff sought to enjoin the city from permitting the waters of Woods creek to flow through the old channel from which it had been diverted when the impounding dam was constructed, to the Snohomish river. The equitable relief sought by plaintiff was denied. From that judgment, the plaintiff has appealed.

The Everett Water Company acquired, by judicial decree in 1901, the right to perpetually divert and impound, for the use of the city of Everett, the waters of Woods creek, a stream located in Snohomish county. The appellant city is the successor in interest of that water company. At that time, the course of Woods creek was easterly, northerly and then southerly and easterly to Mootz lake. From Mootz lake (which was a part of Hardscrabble slough), the water from the creek flowed to the north and northeasterly through

Hardscrabble slough and emptied into the Snohomish river. The water flowing through this natural channel approximated two and one-half million to four million gallons daily.

The water company constructed two impounding dams on land owned by the city. One dam was used for the intake of the pipeline and the smaller dam, farther up Woods creek, was used as a settling reservoir. The two reservoirs impounded all of the waters of Woods creek from that point upstream, and all of the waters, except such as ran over the spillway during a heavy rain, was used for domestic purposes by the city of Everett and by its lessee, Lowell Water District. Such water as escaped over the spillway followed the natural channel and flowed eastward into Mootz lake, which was, as stated above, a part of Hardscrabble slough.

There was testimony that, after the city's diversion and appropriation of the waters of Woods creek, there ceased to be any water in Hardscrabble slough immediately north of Mootz lake to a point approximately three-fourths of a mile north thereof; that the owners of the land on each side of the slough filled in that portion of the slough three-fourths of a mile in length just described; that, ever since, those landowners, or their successors in interest, have used that portion of the old bed of Hardscrabble slough for agricultural purposes, and that no water has flowed through that channel since sometime prior to 1905. About the same time, the landowners dug a drainage ditch from Mootz lake easterly approximately three-fourths of a mile and thence northerly one-fourth of a mile to the Snohomish river.

In 1911, the property owners (the district comprised about two thousand acres) formed a drainage district under the drainage laws of the state. A complete

drainage system was installed. It was deemed unnecessary to take into consideration the former flow of Woods creek through Hardscrabble slough on account of the appropriation and diversion of those waters by the city in 1901. The district utilized Hardscrabble slough and Mootz lake for storage purposes. The ditch referred to above, running from Mootz lake, was improved by an intersecting ditch running north along a railroad right of way and emptying into Hardscrabble slough. A ditch known as the Rucker ditch ran north and south, and tapped the extreme easterly end of the ditch which extended from Mootz lake easterly for three-fourths of a mile and thence northerly one-fourth of a mile to the Snohomish river. The Rucker ditch emptied into the Snohomish river. The outlets of the Rucker ditch and Hardscrabble slough were controlled by floodgates operated so that when the tide ebbed, the water would run out, and as the tide flowed in the gates would automatically close and keep out the tide water.

In July, 1931, the city decided to abandon the water system. The water in the reservoir was allowed to gradually escape and flow down the natural bed of the stream. The waters flowed down into Mootz lake, the original course of the waters of Woods creek prior to their diversion and appropriation in 1901 by the city, thence easterly into the drainage ditches of the respondent. Two weeks after the reservoir had been emptied, the city opened the dam to allow the waters naturally flowing in the Woods creek stream to pass through. That was done July 23, 1931. Alleging the escaping waters deposited sediment and silt in Mootz lake and the drainage ditches, to its damage, respondent filed a claim therefor with the appellant. The claim was rejected, and the two causes of action were instituted, with the result recited above.

■ Appellant complains of the refusal of the court to give to the jury six requested instructions. None of the requested instructions is set forth in the brief. An assignment of error upon an instruction is not entitled to consideration where it does not set out the instruction in full, as required by Rule of Supreme Court VIII, § 2, 159 Wash. xliii. *Lund v. Seattle,* 163 Wash. 254, 1 P. (2d) 301.

■ We also note that the exception to each instruction was:

"Defendant excepts to the refusal of the court to give defendant's proposed instruction for the reason that same is a correct statement of the law and not covered by any other instruction given by the court in said action."

The exception was general, and did not meet the requirements of the rule (Rule of Practice VI, Rem. Rev. Stat., § 308-6) that the exception be sufficiently specific to apprise the court of the points of law or questions of fact in dispute. On that ground, also, the assignment is not entitled to consideration. *Helf v. Hansen & Keller Truck Co.,* 167 Wash. 206, 9 P. (2d) 110; *Kelley v. Cohen,* 152 Wash. 1, 277 Pac. 74; *Davis v. North Coast Transportation Co.,* 160 Wash. 576, 295 Pac. 921.

■ We also observe that respondent's brief is faulty. In the statement of the case by respondent, no reference is made to the statement of facts or to the abstract. This is a violation of Rule of Supreme Court VIII, § 1, 159 Wash. xliii. The rule, so far as material, reads as follows:

"Briefs . . . shall contain a clear statement of the case as far as deemed material by the party, with reference to the pages of the abstract for verification in all instances where an abstract is required. In other instances, the reference shall be to the original record."

Appellant contends that, on the first cause of action, the court erred in not granting the motion for judgment notwithstanding the verdict. It is argued that, from time immemorial, Woods creek has outletted into Mootz lake and thence north to Hardscrabble slough into the Snohomish river; that it was the duty of the respondent district, in the construction of its system of drainage ditches, to have planned its system accordingly; that the appellant had the lawful right to construct the dam as it chose and to permit the waters of the stream to flow through the opening into the channel provided for it by nature; and that the

"Plaintiffs knew or in the exercise of a reasonable discretion should have known that their district was so situated by nature that it would always have to bear the burden of providing an outlet for the waters of Woods creek as it was accustomed to flow in obedience to the law of gravity."

Respondent contends that the diversion and appropriation by appellant in 1901 of the waters of Woods creek was a perpetual appropriation; and that the respondent and other lower property owners

" . . . had a full legal right to assume that such appropriation would continue as a perpetuity; that the respondent drainage district was under no legal obligation to construct at the cost of the land within the district any larger drainage system than was necessary to care for the normal flow of water and drainage at the time the system was installed and was not required to even anticipate the abandonment of the Woods creek system."

In brief, respondent insists that the artificial condition (diverting the water from its original channel and impounding it), created and maintained by the appellant for thirty years, constituted a permanent change, and respondent improved its property in reliance on a continuance of that condition; hence respondent is en-

titled to a continuance of that artificial condition. Appellant counters that the respondent has no right to compel the appellant to maintain its dam for the benefit of the respondent; that the right of the appellant was dominant, and that of the respondent was servient to that end.

The right to divert and impound the waters of Woods creek for municipal purposes was lawfully acquired by appellant in 1901. So long as appellant maintained the dam in such a manner as not to injuriously interfere with the legal rights of others below and above the reservoir, no right of action could be maintained against the appellant. Does it not follow that the appellant could at any time legally abandon that dam and permit the waters, which otherwise would be impounded, to flow as those waters were wont to flow in the natural channel on the property of the respondent, which property was the servient estate? This presupposes, of course, that the water was not released in such a manner as to cast the entire contents of the reservoir in such a short space of time on the land as to flood it.

The acquisition of the right to divert the waters and to maintain a reservoir for impounding those waters, though that artificial condition was maintained by appellant for the prescriptive period, carried with it no reciprocal right to have its maintenance continued for the benefit of the servient estate.

In Farnham, Waters & Water Rights, p. 2422, § 827, is enunciated the rule that

"An artificial condition of a water course may be established which, in favor of its owner, may be as permanent as though the condition was natural, and that the acquisition of a right to maintain this condition carried with it no reciprocal right to have it maintained."

The lower proprietors (the owners of the land within the drainage district) who had improved their property with reference to the change in the course of the stream and the impounding of its waters by appellant, and in reliance on the continuance of that condition, did not acquire a reciprocal right to have the artificial condition remain undisturbed. The appellant could not be compelled to maintain the dam for the benefit of the lower proprietors. The right to maintain the dam, like other rights, could be abandoned. If the doctrine of reciprocal rights obtains, then appellant could never abandon its easement, but must forever maintain the dam for the benefit of the respondent and its successors.

Let us assume that the right of appellant to divert and impound the waters was acquired by prescription, and not by purchase or condemnation. In principle, the case then presented would be no different than the following supposed case: If the owner of a mill on a stream acquired by prescription the right to flow water back upon the land of an upper proprietor, the latter would not acquire a reciprocal right to have the flowage maintained, nor could he compel the mill owner to maintain his dam for that purpose.

"There is no such reciprocal right. The equitable doctrine of prescription depends upon the presumption of a grant, and equity will only presume a grant when certain well-defined conditions are present, one of which is an adverse claim to the property out of which the right is alleged to have arisen. In the case supposed there is no adverse claim on the part of the owner of the submerged land to have the dam maintained, and, therefore, nothing upon which a grant can be presumed. . . . It is thus plain that on principle there is no foundation for a doctrine of reciprocal easements founded upon the prescriptive right of one only of the parties in interest. And the weight of au-

thority is in accord with these principles.'' Farnham, Waters & Water Rights, p. 2400.

If one dam a stream so as to regulate the flow of water to mills below and maintain the dam for the prescriptive period, those having rights in the water can restrain the owner of the dam from holding back the water needed by the mill owners down the stream—the artificial condition becomes the natural condition—but such lower owners can not compel the owner of the dam to continue the dam for the benefit of such lower mill owners. The lower proprietors acquire no easement in the continuance of the dam by the upper proprietor for the prescriptive period, because the lower proprietors have benefited by the erection of such dam. Farnham, Waters & Water Rights, p. 2401.

The fact that the easement acquired by the appellant enabled the respondent to reclaim the land in the drainage district and use it for agricultural purposes is not determinative of the question. Certain rights, the use of the land in a manner of which it was not capable until the diversion of the waters of Woods creek and the installation by respondent of its drainage system, enjoyed by the respondent for the prescriptive period, were made available to the respondent by reason of the exercise of the dominant owner (the appellant) of its legal right to divert and impound the waters of the creek. Though enjoyed for the prescriptive period of time, respondent gained no prescriptive right to a continuance of the condition that made possible the enjoyment of those rights to improve the lands of the district, etc. The filling in of the dry bed of the old channel, and the making of new channels for drainage purposes, hardly constitute adverse user.

'' . ʋ. . a right created for the benefit of the dominant owner its exercise by him cannot operate to

create a new right for the benefit of the servient owner. Like any other right, its exercise may be discontinued if it becomes onerous or ceases to be beneficial to the party entitled. The fact that the exercise of the easement is of advantage to the owner of the servient estate will give him no right to insist on the exercise of the easement on the part of the dominant owner. An easement exists for the benefit of the dominant estate alone, and the servient owner acquires no right to insist on its continuance, or to ask for damages on its abandonment." Farnham, Waters & Water Rights, pp. 2402-2403.

"The owner of the servient estate has a right to confine the owner of the dominant one strictly within his rights, and he may make such use of the artificial condition as he can, subordinate to the rights of the dominant owner. He has the right to fish in, and take ice from, the pond which has been created upon his estate. He, therefore, has certain rights because of the exercise by the owner of the dominant estate of his prescriptive right, but these rights do not extend to the maintenance of the artificial condition." Farnham, Waters & Water Rights, p. 2404.

No right of the respondent was invaded by the appellant. The reservoir was legally constructed and maintained. The appellant had the legal right to discontinue the use of that reservoir at any time it saw fit. The city was careful not to permit the water to rush down in a torrent upon the lower proprietors—in fact, three or four days were expended in emptying the reservoir, and not until two weeks later was the dam opened. There were no flood conditions. The waters of Woods creek had a right to flow as they were wont to flow in the old channel. Had that old channel not been obstructed by respondent, the natural banks of the stream would have carried away the water, and there would not have been the deposit of sediment of which respondent complains.

Such damages as the respondent claims it suffered did not result from any negligence or wrongdoing of the appellant. The appellant was not negligent in the construction, or in the maintenance, of the dam, nor was it negligent in the manner in which it opened the dam and permitted the waters to flow as they had a right to flow, and as the flow would have been if the natural channel had not been closed by respondent.

"The doctrine is—certainly it is the position supported by the great weight of authority—that where the proprietor of an upper tenement constructs and maintains on his own premises, and for his own convenience and advantage, an artificial waterway, or an artificial structure affecting the flow of water, and such structure invades no right of the lower proprietor and gives indication that it is for a temporary purpose, or a specific purpose which may at any time be abandoned, the upper proprietor comes under no obligation to maintain the structure and the conditions produced by it from lapse of time, though the incidental effect has been to confer a benefit on the lower tenant. Nor in such a case does the lower proprietor acquire any right which rests only on prescription. An easement arising in that way can only be established by reason of adverse possession or continuous invasion of another's rights." *Lake Drummond Canal & Water Co. v. Burnham,* 147 N. C. 41, 60 S. E. 650, 125 Am. St. 527, 17 L. R. A. (N. S.) 945.

*Matheson v. Ward,* 24 Wash. 407, 64 Pac. 520, 85 Am. St. 955, cited by respondent, is not in point. We there held that acquiescence in the artificial diversion of a stream from its natural channel by riparian owners below the point of diversion for many years is binding on them, and prevents them from changing the flow of the stream from the new into the old channel.

The judgment is affirmed on the plaintiff's appeal. In the first cause of action, the judgment is reversed,

and the cause remanded with direction to dismiss the action.

TOLMAN, PARKER, and MITCHELL, JJ., concur.

HOLCOMB, J. (dissenting)—I am compelled to dissent from the reversal by the majority on the first cause of action of respondent.

The facts presented on behalf of respondent seem to me inadequately stated in the prevailing opinion. Among other things, it is not stated that appellant had never at any time contributed or paid for any of the original cost of construction, nor maintenance of the drainage system, nor acquired the right to use the drainage system to turn loose or divert the abandoned water into its system. As originally constructed, the drainage district was adequate to handle all water from 1911 to July, 1931. It is entirely inadequate to dispose of the added burden of the additional flow thrown back into the original water course, and it will be necessary to enlarge the drainage system at great expense to the district.

It also appears in evidence that the original flow of Woods creek was insufficient to supply the necessary water required by appellant, and in 1911 it acquired and diverted into the Woods creek reservoir from other sources about one and one-half to two million gallons of water a day from other springs and streams whose natural outlet was other than through Woods creek; and that the water thus acquired and diverted has been added to the Woods creek supply and is part of the water which now flows into this drainage district through the former Woods creek channel, thereby placing an added burden on the drainage district.

The first cause of action was based upon an original trespass of appellant by the casting of waters back into the old water courses to the damage of the drainage

system of respondent. No negligence in the construction of the reservoir nor in its opening and abandonment was alleged or relied upon. It was not necessary or proper to charge negligence on behalf of appellant if its acts constituted trespass upon the property of respondents. Such a trespass consists in an entry on another man's ground without lawful authority and doing some damage, however inconsiderable, to his real property. *Welch v. Seattle & Montana R. Co.,* 56 Wash. 97, 105 Pac. 166, 26 L. R. A. (N. S.) 1047.

In *Great Northern R. Co. v. State,* 102 Wash. 348, 173 Pac. 40, L. R. A. 1918E, 987, this court quoted with approval from *Nevins v. City of Peoria,* 41 Ill. 502, 89 Am. Dec. 392, among other things, as follows:

"The same law that protects my right of property against invasion by private individuals, must protect it from similar aggression on the part of municipal corporations. A city may elevate or depress its streets, as it thinks proper, but if, in so doing, it turns a stream of mud and water upon the grounds and into the cellars of one of its citizens, or creates in his neighborhood a stagnant pond that brings disease upon his household, upon what ground of reason can it be insisted, that the city should be excused from paying for the injuries it has directly wrought? . . . To the extent to which the owner is deprived of its legitimate use and as its value is impaired, to that extent he should be paid."

In our case, *supra,* we held the state liable for damages to the injured property owner, irrespective of negligence on its part.

It must also be remembered that the drainage district exercises quasi-public functions for a public purpose. The drainage of submerged or swamp lands is as necessary as any other kind of reclamation. It is not like a mere lower private owner of a servient estate.

Although respondent cited *Matheson v. Ward,* 24

Wash. 407, 64 Pac. 520, 85 Am. St. 955, only in support of its second cause of action for injunctive relief against appellant, to my mind it has an important influence in sustaining the first cause of action.

In my opinion, the judgment should in all things be affirmed.

