MITCHELL DRAINAGE DISTRICT, APPELLANT, V. FARMERS IRRIGATION DISTRICT ET AL., APPELLEES.

FILED JUNE 29, 1934. No. 28850.

*Morrow & Morrow,* for appellant.

*Neighbors & Coulter, contra.*

Heard before ROSE and PAINE, JJ., and LIGHTNER, REDICK and THOMSEN, District Judges.

LIGHTNER, District Judge.

Injunction to prevent defendant from permitting the waters from Wet Spottedtail Draw to pass through its irrigation canal and into plaintiff's drainage district. The finding was for defendant and plaintiff has appealed.

The appellant will be referred to in this opinion as plaintiff, and the appellees, who are the irrigation district and its officers, as defendant. The controversy pertains to water conditions in and about Mitchell in Scotts Bluff county.

For many years defendant company has intercepted the water from Wet Spottedtail Draw and carried it eastward where it was used for irrigation purposes. Prior to the establishment of irrigation, Wet Spottedtail Draw was a dry slough most of the year. After the establishment of irrigation, and particularly after the construction of the Pathfinder Irrigation Ditch, water came therefrom

mostly in the form of seepage and gathered in the Wet Spottedtail Draw and this is the water in controversy in this case. The Pathfinder Irrigation Ditch is about four miles north of defendant's irrigation ditch. The two irrigation ditches were constructed about the same time, 1906 or 1907. The diversion of the Wet Spottedtail water did not prevent seepage waters from coming down into Mitchell and as a result of such waters plaintiff's drainage ditch was organized in 1913 to take care of such seepage conditions. Plaintiff contends that neither when the ditch was constructed nor afterwards when it was improved on several occasions did it take into account the waters that were coming down in Wet Spottedtail Draw; that it relied on defendant continuing to intercept and carry said waters to the east. However, a spillway was put in when the irrigation canal was first built directly opposite Wet Spottedtail Draw, and just after the completion of the drainage ditches in the spring of 1913, that is, in the fall of 1914, the irrigation district made a needle-gate construction in the south bank of its canal just opposite where Wet Spottedtail Draw comes into the same by which said waters could be let through and continued on down into plaintiff's drainage district. This last was not used except for a few days after it was first constructed and again a few days in 1925 or 1926, after which it was closed due to protests from the plaintiff. The needle-gate was again opened in the fall of 1932 which led to the filing of this suit. Plaintiff obtained a temporary injunction, which on the final hearing was dissolved and a general finding was entered in favor of the defendant.

Plaintiff bases its right to relief upon three grounds: (1) That defendant is estopped by changed conditions and long lapse of time to carry the water through its irrigation canal into plaintiff's drainage district. (2) The defendant irrigation district has obtained a · prescriptive right to the water as against the plaintiff and the plaintiff has obtained a reciprocal right to have the water con-

tinued as it had been flowing during the prescriptive period. (3) That the new watercourse has by the lapse of time become the natural course of the stream and the right to have the stream continue in its present course has become absolute. Closely allied to the last, perhaps part of it, is the claim that these are new waters developed by irrigation, never had any course except that established for them by defendant by being taken into its canal and carried eastward in its irrigation canal. A more complete statement of the facts as found by the district court supplementing what has just been said follows:

"The testimony in this case shows that the Farmers Irrigation District canal, at the point involved in this action, was constructed about 1907, at which time the banks of said canal, where it crossed Wet Spottedtail Draw, were solid earthen works. At this time there was no water flowing in Wet Spottedtail, nor was there a running stream at that point until several years later. In 1911 or 1912 seepage water began to appear in Wet Spottedtail both above and below the Farmers Irrigation District canal. This seepage condition continued in a progressive manner until the lands now within the Mitchell Drainage District were imperiled. As a result the plaintiff drainage district was formed in 1912, the whole of it being below but extending close to the Farmers Irrigation District canal in Wet Spottedtail Draw. In 1913 the drainage ditch as first constructed was completed, it being what was generally termed a plow ditch. In the fall of 1913 or in the spring of 1914, a concrete structure was placed in the south bank of the Farmers Irrigation District canal which would permit the water from upper Wet Spottedtail to pass through the Farmers Irrigation District canal and into plaintiff's drainage ditch. In the meantime a live stream of water had commenced to flow in Wet Spottedtail Draw and probably had been so running since 1912 or 1913, which water was permitted or allowed to flow through the north bank of the Farmers Irrigation District canal into said canal.

During the irrigation season said water was impounded and used for irrigation purposes and in the 'off season' it was carried down the Farmers Irrigation District canal a quarter of a mile and sluiced back to the river. The gate in the south bank of the Farmers Irrigation District canal, according to the evidence, was kept closed by the defendant district until 1925 when it was opened and the water coming down Wet Spottedtail Draw from the irrigated lands above the Farmers Irrigation District canal was permitted to go on through said Farmers Irrigation District canal and into the drainage ditch of the plaintiff. The evidence shows that plaintiff's board of directors complained to the manager of the Farmers Irrigation District about the damage the additional water was causing and that said gate was immediately closed and not again opened until the fall of 1932, at which time this suit was commenced, praying for an injunction.

"The evidence clearly shows that the water complained of arises within the Pathfinder Irrigation District, which district is not a party to this action. * * * The drainage ditch built by the plaintiff is * * * in the natural watercourse of the Wet Spottedtail watershed. * * * Considerable testimony was produced in an attempt to show whether or not the flowing of this water into the Mitchell drain injured the plaintiff. While the evidence was very conflicting, it is the opinion of the court that some damage resulted from the turning of this water into the Mitchell drainage ditch. * * *

"The Farmers Irrigation District * * * has not obtained nor does it claim any right by prescription against the Mitchell Drainage District, the plaintiff herein. The evidence fails to show where the defendant has claimed any right adverse to the plaintiff upon which a reciprocal right could be predicated. * * *

"Plaintiff has not expended money or made improvements in the belief that a permanent, artificial watercourse had been constructed to carry the water of Wet Spottedtail. Plaintiff contends that plaintiff's drainage ditch was

constructed under the belief that no water would ever come down Wet Spottedtail past the Farmers Irrigation District canal. The evidence does not sustain this point. The drainage ditch was built when seepage first appeared and at a time when very little seepage water had appeared above the Farmers Irrigation District canal. The ditch was constructed with a plow in the first instance. It, undoubtedly, being intended that the erosion and sloughing off of the banks and the natural tendency of the water flowing therein to make its own grade would aid in getting the desired results. If the Farmers Irrigation District canal had not been built, or if a siphon had been constructed under the Farmers Irrigation District canal in Wet Spottedtail Draw, can it be said that the same drain would not have been constructed? With the amount of water in Wet Spottedtail increasing progressively since 1913, can it be said that additional construction and repairs would not have been necessary or that the construction and repair work done would not have been required? Plaintiff contends that, if they had known that the waters of Wet Spottedtail were not to have been permanently diverted, they would have constructed bridges instead of culverts over the highways crossing the ditch and saved the expense of replacing them. The evidence shows that a gate was placed in the bank of the Farmers Irrigation District canal in the fall of 1913 or spring of 1914, indicating an intention to let this water through, which was well known to the members of the board of the Mitchell Drainage District and to which they paid no heed. Can we assume that plaintiff would have anticipated that the water of Wet Spottedtail Draw would have progressively increased to such an extent that in the future they would have constructed bridges instead of the sixty-inch culverts which they did construct? It appears to the court that no one foresaw or could have foreseen the result of the application of large quantities of water for irrigation purposes to lands above the Farmers Irrigation District canal, the seepage that followed, or the necessity for large

drains to carry subsurface water back to the river to avoid the saturation of lands to the surface of the ground that would thereby make them of little value. The court fails to find sufficient evidence to support the theory that plaintiff spent large sums of money, or made valuable improvements, under the belief that the change of the course of the stream was permanent, that plaintiff relied thereon, or that said sums would not have been spent for the improvements made but for such belief. It is my opinion therefore that the theory of changed conditions and acquiescense on the part. of the defendant are not supported by the evidence to such an extent that the doctrine of an equitable estoppel should be applied.

"Plaintiff further contends that defendant has acquired a right to the water of Wet Spottedtail by prescription and that plaintiff has obtained a reciprocal right that said waters be not turned back into its drain; that, in legal effect, the new course has become the natural course of the stream. It does not appear from the evidence that defendant has obtained any right adverse to the plaintiff out of which a reciprocal right in favor of the plaintiff could arise. The evidence shows that the state of Nebraska and the United States both claim the return flow from irrigation purposes. The evidence also shows that the defendant has a storage water contract with the United States for certain storage water for use during the irrigation season and that all of the waters flowing down Wet Spottedtail into the Farmers Irrigation District canal is charged against the amount purchased. There can be no dispute that the statute of limitations does not operate against the United States. If the Farmers Irrigation District obtained the use of this water by purchase, it could not be said that their taking of the water could be adverse, especially as against plaintiff."

Plaintiff's main reliance for reversal is upon the principle that the irrigation district by intercepting and using the waters from Wet Spottedtail Draw for more than the prescriptive period has obtained the prescriptive right as

against plaintiff to continue to use them. Plaintiff contends that, plaintiff having lost the right by prescription to have them continue to flow into its drainage district even though the use should be beneficial to plaintiff, and defendant having by adverse use obtained the right to such waters, defendant cannot now cast these waters, which are its waters, back on plaintiff so as to damage plaintiff. Plaintiff further contends that it has relied on a continuance of the diversion so long made by the defendant of these waters and has erected its drainage district without reference to them and on the assumption that defendant wanted them and would continue to use them. It claims that it had the right to build its drainage district in reliance on defendant continuing to do as it had done. There has therefore accrued to plaintiff, so it claims, a reciprocal right to have defendant continue to intercept and care for these waters. Plaintiff's theory of reciprocal rights appears to be sustained by the cases of *Belknap v. Trimble,* 3 Paige (N. Y.) 577; *Mathewson v. Hoffman,* 77 Mich. 420; *Stimson v. Brookline,* 197 Mass. 568, 125 Am. St. Rep. 382; *Kray v. Muggli,* 84 Minn. 90; *Smith v. Youmans,* 96 Wis. 103, 65 Am. St. Rep. 30, 37 L. R. A. 285; *Castle v. Madison,* 113 Wis. 346; *Broadwell Special Drainage District v. Lawrence,* 231 Ill. 86. Defendant on the other hand contends that there is no such reciprocal right. Cases apparently supporting the proposition of defendant are *Goodrich v. McMillan,* 217 Mich. 630, 26 A. L. R. 801; *Lake Drummond Canal & Water Co. v. Burnham,* 147 N. Car. 41; *Drainage District No. 2 v. City of Everett,* 171 Wash. 471. The authorities seem to be hopelessly divided and there is considerable confusion in the application of principles. One of the leading cases in support of plaintiff's position is *Kray v. Muggli, supra,* which holds (see syllabus, 86 N. W. 882): "Where the flow of a stream of water has been diverted from its natural channel, or obstructed by a permanent dam, and such diversion or obstruction has continued for the time necessary to establish a prescriptive right to perpetually maintain the same, the

riparian owners along such stream of water, who have improved their property with reference to the change and in reliance on the continuance thereof, acquire a reciprocal right to have the artificial conditions remain undisturbed; and the person who placed the obstruction in the stream, or caused the diversion of the waters, and all those claiming under or through him, are estopped upon principles of equity from restoring the waters to their natural channel or state to the injury of such riparian owners."

Among the cases cited by plaintiff *Broadwell Special Drainage District v. Lawrence*, 231 Ill. 86, is particularly in point. In that case the natural course of drainage was northeast. However, many years prior to the beginning of the lawsuit, defendant's predecessors in title established a new course of drainage to the northwest. Some time prior to the beginning of the suit, defendant sought to change such course of drainage back to the normal or natural course prior to the change made by his predecessor in title about forty years before. In doing so, he connected the tile drainage from his land with the drainage system established by plaintiff district. This resulted in overcrowding the conduit of the district, backing up water to plaintiff's damage. It was held that, where the owners of a dominant heritage established an artificial channel so as to divert water naturally flowing upon the servient tenement, through which channel the water flowed without interruption for more than twenty years, mutual and reciprocal rights were acquired by prescription, which exempted the dominant owner from the duty of restoring the water to its original course, and released the servient estate from the burden of the drainage.

Another case cited by plaintiff is *Johnk v. Union P. R. Co.*, 99 Neb. 763. This case holds that a riparian owner cannot restore the channel of a stream to its old bed where he did not act promptly and where the owners along the old bed have changed their position in reliance on the stream continuing in its new bed, even though the

statutory period of ten years has not passed. The *Johnk* case is cited by plaintiff in support of its position, but it is not in our opinion in point. The holding in the *Johnk* case was based on acquiescence and estoppel. The court say: "Had defendants taken steps to restore the stream to its former channel promptly, before the former channel had been obstructed by silt and vegetation, and before plaintiffs had incurred expense in supplying their want of water by artificial means, there is no doubt they would have had the right to do so, but we think their acquies- cence and the changed conditions warrant the relief grant- ed plaintiff by the district court." The difference it seems to us is that a stream beginning to flow in a new channel presents at once the condition of permanency, while the Wet Spottedtail waters were always diverted for a specific and temporary purpose and the needle-gate and overflow were a continuing notice of a claimed right to restore them to their original course.

Many quotations could be given from the cases which support plaintiff's contentions, but we do not believe that it would serve any good purpose to do so. The above illustrate the principles upon which they rest.

Turning now to an examination of the authorities cited by defendant. One of the cases it relies on is *Greisinger v. Klinhart,* 282 S. W. (Mo. App.) 473. This case was taken to the supreme court by certiorari where the judg- ment of the trial court which had been reversed by the court of appeals was affirmed. *Greisinger v. Klinhardt,* 321 Mo. 186, 9 S. W. (2d) 978. However, the facts in that case and the principles applied by the supreme court do not in my judgment make it an authority of any great value in favor of either plaintiff or defendant. The su- preme court in 321 Mo. 186, held: "The owners of differ- ent parcels of land adjacent to an artificial lake, acquired from a common owner without reservations, have an equal right to maintain the lake and the dam which holds the water. The ownership of the land adjacent to the lake determines the right to maintain and use the lake. Where

all the land borders the lake and belonged to one owner and passes from him in different parcels to different grantees, the right to use and maintain the lake attaches to the different parcels, and under the principle of reciprocal easements the upper owner cannot cut off the supply of water, nor the lower owner remove or destroy the dam or lower the water, without mutual agreement or joint action."

*Goodrich v. McMillan,* 217 Mich. 630, 26 A. L. R. 801, is also relied on by defendant. This was a case where a lake was established by a dam, or at least the level of the lake was raised by a dam, which went out, and defendant decided not to rebuild it and made a contract with the owner of the flowed lands to surrender the flowage rights. The plaintiffs had established summer cottages, hotels and other improvements with reference to the artificial level thus established. The finding was against the contention of the plaintiffs to the effect that they had the right to rebuild the dam and maintain the waters at the artificial level where it had been maintained above the natural level for nearly seventy years. The *Kray v. Muggli* case, *supra,* is referred to in the following language: "Plaintiffs contend that they have acquired the reciprocal right to have the waters maintained at the artificial level; that such level, in legal effect, has become the natural level. They cite *Kray v. Muggli,* 84 Minn. 90, 54 L. R. A. 473, 87 Am. St. Rep. 332. This decision overruled [*Kray v. Muggli*] 77 Minn. 231, 45 L. R. A. 218. It supports plaintiffs' contention. But it is said in 27 R. C. L. 1206, that 'this decision has been severely criticized,' and in 3 Farnham on Waters and Water Rights, 2406: 'There seems to be no principle on which *Kray v. Muggli* can be supported.' And it is indicated in *Lake Drummond Canal & Water Co. v. Burnham,* 147 N. Car. 41, 17 L. R. A. n. s. 945, 125 Am. St. Rep. 527, that 'the Minnesota decision and some others of like tendency are not in accord with the weight of authority.' "

Those authorities which hold in plaintiff's favor do so

largely it seems to us on the ground that there has been a permanent obstruction or diversion. In *Matheson v. Ward*, 24 Wash. 407, 85 Am. St. Rep. 955, one fork of a river was dammed many years before so as to divert the waters into the remaining forks. This condition of affairs had been carried on for many years and the farmers below the point of diversion had improved their farms in reliance upon a continuance of the same conditions. In *Hollett v. Davis*, 103 Pac. 423 (54 Wash. 326) it was held: "The proprietor of a stream who diverts it into an artificial channel, and continues such change for a time exceeding the statute of limitations, is estopped, as against a person making a beneficial use of the water, to return it to its natural channel to the latter's injury."

This is the same court that held very recently in *Drainage District No. 2 v. City of Everett*, 171 Wash. 471, that because the city had maintained a dam for a number of years and plaintiff had established its drainage district in reliance upon a continuance thereof and the people in plaintiff's drainage district would be greatly damaged by removing the dam and turning the waters back into their old channel did not make it obligatory upon the city to continue to maintain the dam for the benefit of such lower owners. While the rights of the city in this case were obtained by judicial decree, and not by prescription, much that is said in the opinion is applicable to the facts now before us.

The situation in *Broadwell Special Drainage District v. Lawrence*, 231 Ill. 86, very much resembles plaintiff's situation here, yet between the two cases are several distinguishing features, most noticeable of which is the apparent permanency of the diversion in the *Lawrence* case which is not so apparent here on account of the spillway and needle-gate.

In *Lake Drummond Canal & Water Co. v. Burnham*, 147 N. Car. 41, plaintiff, operating a canal for public travel, had obtained many years before the right to maintain a cross canal as a feeder of water into its main

canal. Later deciding that it did not require such additional waters, it blocked off and obstructed the cross canal. Defendant landowners opened it by force. They claimed to receive an incidental benefit through drainage by the cross canal. Defendants' lands did not abut the cross canal, but were several miles from it and natural drainage was in a different direction. Held, that defendants could not compel the plaintiff to maintain the cross canal for their protection. *Kray v. Muggli, supra,* is criticized, and *Belknap v. Trimble, supra,* is distinguished and upheld on the ground of permanency, dedication and estoppel. The opinion emphasizes the idea that a different principle applies where the structure is for a temporary or specific purpose and where it is permanent.

There is, it must be conceded, a clearly distinguishable difference between a prescriptive right obtained for a temporary or specific purpose and one that from the beginning was, or later became, of a permanent character. Dams for mills illustrate the first. A diversion of water out of the old bed of a stream in order to make it more fit for agriculture illustrates the second. The effect may be the same in both, but the purpose is different. The first is for the benefit of the builder of the dam. Advantages accruing to upper or lower owners are incidental only. The second may be for the very purpose of benefiting the owners of the land and they begin at once to make their improvements in reliance on the change thus made being permanent.

A dam is generally held to be a structure for a specific and temporary purpose, although of course it may continue for many years. The placing of the needle-gate in the south bank of defendant's irrigation district was a continuous notice and threat to the plaintiff that the waters from Wet Spottedtail Draw might be let through. Neither can the plaintiff rely upon an estoppel because, as found by the district court, it was not shown that its ditch and other improvement would have been any different if the needle-gate had been opened and the flow continued

year after year. The fact is that the diversion of these waters has been beneficial to the plaintiff. It cannot build up a right, on account of benefits received, to continue to receive such benefits unless in reliance thereon it has altered its position to its detriment.

The reasons for the doctrine which militates against plaintiff are stated in 3 Farnham, Waters and Water Rights, pp. 2402, 2403: "The fact that the exercise of the easement is of advantage to the owner of the servient estate will give him no right to insist on the exercise of the easement on the part of the dominant owner. An easement exists for the benefit of the dominant estate alone, and the servient owner acquires no right to insist on its continuance, or to ask for damages on its abandonment." And at page 2406: "If he (the owner of the servient estate) suffers injury it is purely from his own negligence. There is not an instant during the time that the prescriptive period is running when he could not compel the owner of the dam to remove it or to enter into a contract giving the owner of the submerged land a right to maintain it, which contract might be executed and recorded in such a way as to leave no doubt as to his right to maintain the dam for his own benefit. The law favors diligence and a disposition to protect one's own rights, and is not disposed to permit one to acquire rights against another by passive acquiescence in his transactions."

Plaintiff claims that these are new waters; that they never had any course except that established for them by defendant. While the waters may have been new the course was old. An unprecedented rainfall would have resulted in more waters flowing in the old course, but they would still be entitled to flow in the old course. Could plaintiff have refused the waters because they are new if they had never been intercepted or diverted? The question answers itself. Plaintiff has no valid legal reason for refusing them and none in logic by reason of the fact that they are new. There is a line of authorities to

the effect that, when one improves his property in reliance on the artificial condition created, he will be protected, especially if the owner of the dominant estate continues to exercise his rights. Examples of such are *Kray v. Muggli,* 84 Minn. 90, *Smith v. Youmans,* 96 Wis. 103, and *Castle v. Madison,* 113 Wis. 346, where the construction of a dam raised the level of a lake or caused the formation of a lake where one did not exist before, and the owner of the servient estate built houses or perhaps hotels and pleasure resorts with reference to the new shore line thus created. In the above cases the courts held that reciprocal rights and duties were created, and that the owner of the dam could not remove the same, especially where he does not propose to abandon or surrender his easement. *Goodrich v. McMillan,* 217 Mich. 630, takes the opposite view on practically identical facts and holds that the owner of the dam owes no duty to the servient estate.

Other cases, such as *Belknap v. Trimble,* 3 Paige (N. Y.) 577, *Mathewson v. Hoffman,* 77 Mich. 420, and *Matheson v. Ward,* 24 Wash. 407, are where the entire course of a stream was changed and where the owners along the old course had improved their property with reference to the change. These are often cases where farm lands which before had been marshy and useless have become arable and suited for agriculture and where people have built their homes relying on the stream continuing to flow in its new channel. The holding of the court must to a great extent depend upon the facts of the particular case before it. While the weight of recent authority supports the proposition that no reciprocal right accrues to the servient estate simply from adverse user for the prescriptive period, rights may accrue to the servient estate from estoppel, dedication or acquiescence. A number of opinions refer to the fact that the dominant owner does not intend entirely to abandon his easement as important. *Smith v. Youmans,* 96 Wis. 103. Unquestionably the owner of a dominant estate does not generally owe the

servient estate any duty except not to injure him by irrational conduct or wantonly or capriciously. *Taft v. Bridgeton Worsted Co.*, 237 Mass. 385, 13 A. L. R. 928. Defendant pleads that its purpose in carrying the waters through its canal and into plaintiff's drainage district is to prevent the formation of large deposits of mud and silt which greatly damages its canal. No claim is made that its action is irrational, wanton or capricious. The estate is for the benefit of the one that is dominant, and the servient estate remains servient. While there are many cases where rights accrue to the servient estate on account of acquiescence or estoppel, the mere intercepting of the waters by defendant irrigation district would not and could not give the plaintiff drainage district any rights. The use of it was for the benefit of defendant irrigation company. Through use of such waters for ten years or more the irrigation company might obtain the right to continue to use them. This would give no corresponding or reciprocal rights to the drainage district to require the irrigation district to continue to use or care for the waters unless the defendant became estopped, and the only estoppel suggested in this case is the alleged fact that the drainage district was established and its money expended to defendant's knowledge under the belief induced by defendant that the drainage district would never be asked or required to take care of these waters. Plaintiff to acquire any rights would have to show that it improved its property with reference to the diversion and in reliance on a continuance thereof, which it had no right to do in view of the needle-gate and spillway. The water in Wet Spottedtail Draw progessively increased; plaintiff made no showing that defendant constructed its drainage ditches different or expended more money relying on the diversion, and in view of the spillway and needle-gate it had no right to so rely. Furthermore, plaintiff never had the right to use these seepage or waste waters and therefore the use of them by defendant was not adverse. See *Lambeye v. Garcia*, 18 Ariz. 178, where-

in it is held: "The authorities hold that, while the water so denominated as waste water may be used after it escapes, no permanent right can be acquired to have the discharge kept up, either by appropriation, or a right by prescription, estoppel or acquiescence in its use while it is escaping, and that, too, even though expensive ditches or works were constructed for the purpose of utilizing such waste water, unless some other element enters into the condition of affairs, other than the mere use of the water." The use of the water by defendant was not adverse for two reasons: (1) Plaintiff never had a right to it; (2) defendant's use was favorable and conferred a benefit on the plaintiff. Furthermore, the district court expressly holds that plaintiff drainage district was not constructed under the belief that no waters would ever come down Wet Spottedtail Draw past the Farmers Irrigation District canal. This finding is sustained by the evidence. It thus appears that the necessary elements to constitute an estoppel are lacking. Our conclusion is that the weight of recent authority supports the proposition that no reciprocal right accrued to plaintiff because defendant intercepted and used these Wet Spottedtail waters; that even if such right exists plaintiff has not fully brought itself within the principle of the authorities it relies on, since all idea of permanency is destroyed by the spillway which was put in when the dam was constructed and by the needle-gate which was put in in the fall or early winter after the completion of plaintiff's original drainage ditch; that if plaintiff could acquire any rights to demand of defendant that it continue to intercept and use those waters, such right would have to be based on principles of acquiescence, dedication or estoppel, and that the facts here do not justify a finding in plaintiff's favor on such grounds. The judgment of the district court is therefore

AFFIRMED.