In re Formation of Drainage District No. 5 of Dawson
County, Nebraska.
Hiddie Kuhlman et al., Appellees, v. Fred Folkers et
al., Appellants.
136 N. W. 2d 364

Filed July 16, 1965.   No. 35941.

William S. Padley, for appellants.

Smith Brothers, for appellees.

Heard before WHITE, C. J., CARTER, BOSLAUGH, BROWER, SMITH, and McCOWN, JJ., and WESTERMARK, District Judge.

CARTER, J.

This is a proceeding commenced under the provisions of Chapter 31, article 3, R. R. S. 1943, for the organization of Drainage District No. 5 of Dawson County, Nebraska. Objections were filed to the organization of the district by certain landowners. A trial was had on the application and the objections thereto. The trial court found against the objectors, the proposed drainage district was declared organized as a public corporation, and it was adjudicated that all the real estate described in the application, except one tract that was voluntarily removed, was properly in the district and would be benefited by the proposed improvement. The objectors have appealed.

The drainage district as organized by the trial court contains 1,133.4 acres of land. The proponents are the owners of 631.8 acres. The objectors are the owners of 501.6 acres. The district. contains more than 160 acres of wet or overflowed land, as the statute requires, and there is no issue as to that fact. It is the contention of the objectors that they will not be benefited by the

improvement and should not be included within the boundaries of the district, and that the purpose and intent of the statute is not met for the reason that the true purpose of the district's organization is to require objectors to receive and drain away waters which are the legal responsibility of others and for which they ought not to be required to pay.

The proceeding for establishment of a drainage district as a public corporation under Chapter 31, article 3, R. R. S. 1943, is purely statutory. Objectors to the organization must be excluded from the district if their lands will not be benefited by the improvement. The feasibility and route of the drainage ditch is an engineering problem and is not a matter to be determined in a proceeding for the establishment of the district. If lands within the district will be benefited by the improvement, they are proper to be included within the district. The amount or degree of the benefit is not material in a proceeding to establish the district since the amount and degree of benefit is an issue only in the assessment of benefits. Petersen v. Thurston, 157 Neb. 833, 62 N. W. 2d 68. Swamp or overflowed lands within the meaning of the statute apply to lands which from excessive rainfall or other causes retain at some seasons of the year excessive water which damages and renders them unfit for cultivation or profitable use. Petersen v. Thurston, 161 Neb. 758, 74 N. W. 2d 528.

The evidence in the case shows the land and water table elevations at 25 stations shown on the plat included in this opinion and appearing on the following page. It will be observed that the ground water table is high in the north part of the proposed district and along the course of the proposed drainage ditch. At the time of the trial a drainage ditch 6 feet in depth was contemplated, although it would be deeper where land elevations require it to maintain the flow line of the ditch. The fall of the ditch from the north end at station 2 to the south end at station 23 is approximately 10 feet.

The fall from station 23 to the river is 5 feet, which is deemed adequate. Some contention is advanced that the 6-foot ditch is not adequate and that a ditch of 8 or 9 feet in depth would be much more efficient. The expert testimony is that a ditch of the latter depth would not provide adequate fall to the river at the proposed outlet and would require the turning of the drainage ditch to the southeast, if it could be done at all, to secure ade-

quate fall if the ditch is built at a lower depth. These questions involve engineering problems with which this court cannot concern itself in this proceeding. The engineer for the objectors testified to the probable inefficiency of the 6-foot ditch but concedes that drainage in the area is needed.

The evidence sustains a finding that the high-water table in the area has brought harmful salts and alkali to the surface of the ground and caused an infestation of salt and sedge grasses of little value. This has resulted in the loss of the more valuable native grasses which would be brought back by the drainage of the area. There is evidence that the lands, if drained, would produce other crops in abundance and greatly increase their market value. Some contention is advanced that the drainage ditch would be of little benefit to areas where the water table is lower than the flow line of the drainage ditch such as is found at stations 9, 15, 18, and 25. The evidence is, however, that such areas would be benefited by the construction of the drainage ditch. The extent of the benefits is a matter to be considered in the assessment of the benefits and is not material in the present case.

The evidence shows that the lands of Hayes, Bartlett, Sitorius, H. Folkers, and Kloepping are subject to flooding and will be relieved by the drainage ditch. The other lands are boggy and at times have standing water on them, or in nearby road ditches.

It is argued by some of the objectors that the high water table subirrigates their lands and that they are content with them as they are. This is not, however, a controlling factor. The question is whether or not the land would be benefited by the drainage of their lands. One whose lands are benefited is not permitted to exclude himself from the district merely because he prefers to keep it in its present condition and thereby gain the benefit of the improvement without cost.

The evidence shows that the drainage of the water-

logged lands would not of itself increase the benefits to a maximum. To accomplish such a result it would be necessary for the landowner to level his land and apply irrigation water to it to remove the salts and alkali in a minimum period of time. Objectors argue that the burden of such costs, in addition to the assessments for the construction of the drainage ditch, should be considered in determining if their lands are benefited by the improvement. In 17A Am. Jur., Drains and Sewers, § 18, p. 453, it is said: "The mere fact, moreover, that it may be necessary for the owner of property to incur expense in order to avail himself of the benefits or services afforded by the improvement is not a valid objection to the inclusion of such property in an improvement district, upon the theory that he would thereby be deprived of his property without due process of law, or denied the equal protection of the laws, in violation of constitutional guaranties." See, also, Valley Farms Co. v. Westchester County, 261 U. S. 155, 43 S. Ct. 261, 67 L. Ed. 585.

The burden of proof is on an objector to show that his lands will not be benefited by the proposed improvement in order to have his land excluded from the drainage district. Petersen v. Thurston, 157 Neb. 833, 62 N. W. 2d 68. We think the evidence as to the lands benefited preponderates in favor of the proponents. The trial court after hearing the evidence and inspecting the lands in the proposed district concluded that the objectors had failed to prove that their lands would not be benefited by the improvement. We think the trial court correctly determined that the lands in the proposed district would be benefited by drainage.

It is contended by the objectors that an upper riparian landowner has no right to obstruct or change a watercourse and at a much later date be authorized to divert water back to the original watercourse upon the owners of the lower riparian lands. In determining this issue it is necessary to consider the general nature of the

area and the sources of the seepage and floodwaters which contribute to or cause the conditions existing in and on the lands contained in the proposed district. It is asserted by the objectors that their lands should not be burdened with these seepage and floodwaters and that the organization of the district and the construction of the drainage ditch is an attempt to impose the cost of drainage upon them when the legal liability therefor is upon others.

The evidence shows that the proposed drainage ditch lies in the lower end of a natural drain which extends from the Platte River in a northwesterly direction for a distance of 14 or 15 miles north of the city of Gothenburg. For convenience we shall refer to this natural drainway as Anderson Creek, as do some of the witnesses. There is no evidence that Anderson Creek is a live stream, although it picks up seepage and floodwaters in a rather extensive watershed. In 1895 the Cozad Irrigation Canal was constructed across Anderson Creek at what is now the north boundary of the proposed drainage district as shown on the plat. The land to the north of the Cozad Irrigation Canal is higher than the canal, with the result the seepage and floodwaters flow into the canal over or through its north bank.

The evidence is that when the Cozad Irrigation Canal was carrying irrigation waters, seepage and floodwaters from the north flowed into and overtaxed the capacity of the canal. To prevent these excess waters from going east in the canal to the damage of the irrigation canal company, a check was placed in the canal immediately north of the northeast corner of Section 19. This had the effect of turning the excess waters to the west where they were discharged to the south through a spillway about 2 miles distant in Section 13.

The water coming down Anderson Creek from the north has increased as drainage and road ditches have been straightened, farm lands leveled, and irrigation developed until the Cozad Irrigation Canal could no

longer handle these waters as before. From time to time the south bank of the canal was overflowed causing the flooding of lands in the proposed drainage district. Seepage from the lands to the north and the Cozad Irrigation Canal, together with natural rain and snowfall, found their way into the proposed drainage district and contributed to the raising of ground water levels and the wet swampy conditions there existing. It is proposed that with the construction of the drainage ditch the seepage and floodwaters from the watershed of Anderson Creek lying northwest of the Cozad Irrigation Canal shall be permitted to pass through the canal into the proposed drainage ditch. The Cozad Irrigation Company has agreed to provide the spillway for this purpose and to place the regulating controls in the hands of the board of directors of Drainage District No. 5 of Dawson County. In addition thereto the Cozad Irrigation Company agrees to pay its share of the benefits in the construction of the drainage ditch. The objectors contend, however, that the seepage and floodwaters coming from the north of the Cozad Irrigation Canal are the sole responsibility of the Cozad Irrigation Company and that it is without legal authority to discharge such waters into the proposed drainage ditch.

There is no evidence in this record that the Cozad Irrigation Company has made any use of the seepage and floodwaters from the north. The evidence is that such waters create a drainage problem which has been a constant concern for the last 60 or 70 years. The Cozad Irrigation Company has refrained from discharging these waters into the part of the natural drain south of its canal because of the damage it would do to lands in that area. It is not here claimed that irrigation waters flowing in the canal are or will be discharged into the proposed drainage ditch since the flow of water in the irrigation canal is controlled at a point four miles west of the proposed drainage district. The problem is, therefore, solely a matter of providing an outlet to the

river for seepage and floodwaters coming down the Anderson Creek watershed area.

We think the seepage and floodwaters from the north are not waters belonging to, or to be controlled by, the Cozad Irrigation Company as the objectors contend. This is so even if the Cozad Irrigation Company has diverted these waters for a long period of time for the purpose of providing an expedient method of getting these waters to the Platte River with minimum damage to lower lands in the course of natural drainage.

An upper riparian owner, constructing and maintaining an artificial structure in a natural drain affecting the flow of seepage and floodwaters for temporary purposes advantageous to it, is not ordinarily obligated by mere lapse of time to maintain the structure or the conditions produced by it, even though it incidentally benefits lower landowners.

In the instant case, if the Cozad Irrigation Canal had not been built, or if a siphon had been built under it in the course of natural drainage, the lower landowners could have no possible cause for complaint. The argument of objectors is that the construction of the irrigation canal permanently changed the watercourse and that they had a right to rely upon the change. This argument has no merit in the absence of facts supporting an equitable estoppel.

In the case of Mitchell Drainage Dist. v. Farmers Irr. Dist., 127 Neb. 484, 256 N. W. 15, the factual situation was very similar to the facts in this case. There the Farmers Irrigation District built its irrigation canal across Wet Spottedtail Draw. For many years the Farmers Irrigation District received the waters from Wet Spottedtail Draw and used them as irrigation water. When the waters of Wet Spottedtail Draw increased because of increased seepage and floodwaters, the Farmers Irrigation District discharged such waters into the drainage ditch of the Mitchell Drainage District in the natural watercourse lying below the Farmers Irrigation

District Canal. The Mitchell Drainage District sought to enjoin the discharge of the waters of Wet Spottedtail Draw into the natural watercourse on the theory that the Farmers Irrigation District had appropriated the new waters and changed their natural course over a long period of time and that it could not subsequently return them to the natural drain. In denying the injunction, this court said: "While there are many cases where rights accrue to the servient estate on account of acquiescence or estoppel, the mere intercepting of the waters by defendant irrigation district would not and could not give the plaintiff drainage district any rights. The use of it was for the benefit of defendant irrigation company. Through use of such waters for ten years or more the irrigation company might obtain the right to continue to use them. This would give no corresponding or reciprocal rights to the drainage district to require the irrigation district to continue to use or care for the waters unless the defendant became estopped, and the only estoppel suggested in this case is the alleged fact that the drainage district was established and its money expended to defendant's knowledge under the belief induced by defendant that the drainage district would never be asked or required to take care of these waters. Plaintiff to acquire any rights would have to show that it improved its property with reference to the diversion and in reliance on a continuance thereof, which it had no right to do in view of the needle-gate and spillway. The water in Wet Spottedtail Draw progressively increased; plaintiff made no showing that defendant constructed its drainage ditches different or expended more money relying on the diversion, and in view of the spillway and needle-gate it had no right to so rely. Furthermore, plaintiff never had the right to use these seepage or waste waters and therefore the use of them by defendant was not adverse. See Lambeye v. Garcia, 18 Ariz. 178, wherein it is held: 'The authorities hold that, while the water

so denominated as waste water may be used after it escapes, no permanent right can be acquired to have the discharge kept up, either by appropriation, or a right by prescription, estoppel or acquiescence in its use while it is escaping, and that, too, even though expensive ditches or works were constructed for the purpose of utilizing such waste water, unless some other element enters into the condition of affairs, other than the mere use of the water. ' " See, also, 56 Am. Jur., Waters, § 244, p. 701; Drainage Dist. No. 2 v. City of Everett, 171 Wash. 471, 18 P. 2d 53, 88 A. L. R. 123.

There is no evidence in this case that the waters from north of the irrigation canal, and which flowed into it, were appropriated for the use of the irrigation canal company. It shows that the diversion was for the sole purpose of facilitating their drainage to the Platte River without damage to lower landowners. The lower landowners, including these objectors, did nothing in reliance on the diversion of these seepage and floodwaters. They neither constructed any structures nor expended any money in reliance on the continued diversion of these waters. There is no evidence in the record to support any theory of an equitable estoppel that would deprive the irrigation canal company of its right to permit the flow of these waters through or under its canal into the natural watercourse. We think that the seepage and floodwaters arising in the Anderson Creek watershed which flow into the Cozad Irrigation Canal may be properly discharged into the natural drain where they were wont to flow in a state of nature, there being no basis for an equitable estoppel to prevent the canal company from so doing.

We find that each assignment of error asserted by the objectors is without merit for the reasons herein. stated. The judgment of the district court is correct and it is affirmed.

AFFIRMED.