[1] Reported in 123 P.2d 733.
This case involves, first, an appeal, in the estate of Lars Peterson, deceased, from an order (a) sustaining objections to the final report of the then acting administrator de bonis non; (b) vacating former allowances of fees to the attorney and to the original administrator of the estate; (c) making a considerably smaller allowance of fees to the attorney and allowing no fee at all to the administrator; (d) setting aside certain transfers, assignments, and sales of property of the estate which had theretofore been made to the attorney and accepted by him in part payment of his original fees; (e) commanding the return to the estate of all property so acquired by the attorney; (f) directing the *Page 692 
attorney to make an accounting of all income received and all disbursements made by him in connection with the property which had come into his possesion; (g) removing the acting administrator de bonis non and appointing another person in his stead; and (h) making a certain additional allowance to the attorney for his services in caring for the property of the estate while in his possession and under his control. The case also involves a cross-appeal, in the same estate, by the substituted administrator de bonis non and by the objectors to the final report, from so much of the final order as allowed the attorney any fee or compensation whatsoever. And finally, the case involves an appeal, in the estate of Lars Albert Peterson, deceased (son of Lars Peterson and hereinafter referred to as L.A. Peterson to distinguish him from his father), from an order (a) incorporating as part thereof the previous order made in the estate of Lars Peterson, and (b) removing the administrator of the estate of L.A. Peterson and appointing in his stead an administrator de bonis non.
Subsequent to the giving of the notices of appeal and cross-appeal, the two probate proceedings, which are intimately connected with each other, were consolidated for hearing and disposition by this court. The appellants herein are C.A.J. Taylor, former administrator de bonis non of the estate of Lars Peterson and former administrator of the estate of L.A. Peterson, and James C. McKnight, his attorney in both estates. The respondents and cross-appellants are Mina Quillin, the assignee of a creditor of L.A. Peterson's estate, Neola (or Neaola) Taylor Higgins, an heir at law of L.A. Peterson, and, nominally at least, Thomas L. Burns, who has been appointed as administratorde bonis non in both estates, in place of C.A.J. Taylor.
The various proceedings and transactions involved *Page 693 
in this litigation and brought to this court for review cover a period beginning in September, 1924, and extending to the present time. A study of the record reveals a deplorable picture of the mismanagement and dissipation of a large estate supposedly being administered in an orderly fashion, and makes necessary a rather lengthy statement of the case in order to convey a clear understanding of the questions to be decided. Many of the details here presented have been set forth in one or another of four previously reported cases in this court, each of them directly or indirectly affecting the estate of Lars Peterson. Those cases are: In the Matter of the Estate of Mary Taylor Peterson
(Neaola Taylor Higgins, Appellant, v. L.A. Peterson et al.,Respondents), 137 Wn. 137, 241 P. 964; Neaola TaylorHiggins et al., Appellants, v. L.A. Peterson, as Administrator,Respondent, 150 Wn. 620, 274 P. 186; National Bank ofCommerce, Respondent, v. L.A. Peterson, Appellant, 179 Wn. 638,38 P.2d 361; and In the Matter of the Estate of LarsPeterson (C.A.J. Taylor, as Administrator, Respondent, v. MinaB. Quillin et al., Appellants), 6 Wn.2d 294, 107 P.2d 580.
Lars Peterson, a widower and a long-time resident of Seattle, died intestate in that city on September 20, 1924. His former wife, Mary Taylor Peterson, had passed away about twenty-six years previously, on March 19, 1898. Mrs. Peterson had been married before to one Charles W. Taylor, and had borne him two children: Neola Taylor (now married to H.W. Higgins), one of the objectors, respondents, and cross-appellants herein, and C.A.J. Taylor, the former administrator de bonis non of the estate of Lars Peterson and former administrator of the estate of L.A. Peterson, now one of the appellants herein. There was born to Lars Peterson and Mary Taylor Peterson one child, the above-mentioned L.A. Peterson, who died October *Page 694 
17, 1937, after many of the events herein related had transpired, but prior to the filing of the final report in his father's estate.
Following the death of Lars Peterson, his son and sole heir, L.A. Peterson, was appointed special administrator of the estate on September 22, 1924, and was appointed general administrator on October 6, 1924. He retained as his attorney James C. McKnight, who has continued in that capacity with respect to the estate ever since. On May 25, 1925, the probate court approved L.A. Peterson's report as special administrator and allowed him and his attorney each a fee of three hundred dollars.
Shortly prior to that, L.A. Peterson had filed his first report as general administrator. On June 13, 1925, the probate court approved the report and at the same time allowed the administrator a fee of one thousand dollars, and his attorney, Mr. McKnight, a fee in a like amount. The report recited that, as shown by the inventory and appraisement theretofore filed, property to the value of $243,012.05, as of March 31, 1925, had come into the hands of the administrator. In view of the fate sustained by the various properties of the estate in consequence of the transactions which we are now required to scrutinize, we shall quote the inventory and appraisement in full, except for the omission, wherever possible, of technical legal descriptions of the real property. For convenience, we shall also list, in connection therewith, the amount of encumbrances against the respective real properties:

 Mortgage or
 Appraised contract
 Description value indebtedness.
 "REAL ESTATE
 (1) "Ingomar [now Park] Apartments ....... $35,000.00
 (2) "Capitola Apartments ................. 65,000.00 [$14,139.95]
 (3) "Bristol Apartments .................. 45,000.00 [$29,289.07]
 (4) "Part of Lot 2, Block 62, Denny's
 Addition ........................... 14,000.00
 (5) "Part of Lot 3, Block 62, Denny's
 Addition ........................... 10,000.00
 *Page 695 
 (6) "Three lots in Denny-Fuhrman's
 Addition ........................... $7,000.00
 (7) "Lot 7, Block 27, Pontius Addition ... 3,500.00
 (8) "Bellevue Apartments ................. 45,000.00 [$19,607.90]
 ___________ ____________
 "TOTAL ......................... $224,500.00 [$63,036.92]
 "PERSONAL PROPERTY
 (9) "Household Articles, ................. $500.00
(10) "One Cadillac Automobile ............. 1,000.00
(11) "One Watch, one Ladies [sic] Dinner
 Ring, set with small diamonds
 and one small Gold Ring,
 and other small articles of Jewelry, 200.00
(12) "One Gold Ring, set with a large
 Diamond, one Tie Pin, set with
 large Diamond, two Shirt Studs,
 each set with a small Diamond
 and one Gold Ring, set with
 small Diamond, 1,400.00
(13) "Cash on Deposit in Seattle National
 Bank, $5225.27 5,225.27
 and
 "Cash on person of decedent at
 death $54.00 54.00
 and
 "Cash refunded from United States
 for mistake in Income Tax $125 125.00
(14) "Seventy Shares of Stock in the
 Lion Oyster House Company, a
 corporation, of Seattle, Washington,
 par value $100 each, or
 a total par value of $7,000.00, 7,000.00
(15) "Balance of Note due decedent
 from Geo. W. Miller and Lottie
 O. Miller, secured by a mortgage
 on Lot Two (2) in Block One
 (1) of H.L. Yesler's 1st Addition
 to Seattle, King County, Washington,
 amounting to $2,007.78
 at the death of said decedent, 2,007.78
(16) "Ten Shares of Stock in the Community
 Hotel Corporation, a corporation,
 of Seattle, Washington,
 of the par value of $10 each, or
 a total par value of $100.00, [No value given]
 "One Second Mortgage Sinking
 Fund Seven per cent Gold Bond
 of the Community Hotel Corporation
 of Seattle, Washington,
 No. a. M. 1268, for $1000.00, 1,000.00
(17) "The Cave Mine in the State of
 Idaho, located in Custer County
 on Bay Horse Creek, which may
 have reverted to the Government
 for want of assessment
 work ............................... 000.00
 __________
 [TOTAL $18,512.05]"
 *Page 696 
On the basis of this inventory, the following summary can be made:
 Appraised value Encumbrances
Real Property $224,500.00 $63,036.92
Personal property 18,512.05
 ___________
 Total Appraised value $243,012.05
 Encumbrances 63,036.92
 ___________
 NET VALUE $179,975.13

L.A. Peterson's first report, made on May 8, 1925, recited that he had allowed in full: (1) a claim of the Seattle National Bank for six thousand dollars plus interest, based on a note executed by his father; (2) a claim of C.A.J. Taylor (L.A. Peterson's half-brother) in the sum of fifteen hundred dollars, for wages; and (3) a claim of Bonney-Watson Co. amounting to twenty-eight hundred dollars for funeral expenses and cemetery charges. He further stated in his report that Neola Taylor Higgins (his half-sister and one of the objectors in the present proceeding) had filed a claim in the sum of $234,666.66, under an alleged trust arrangement between herself and Lars Peterson and his wife, Mary Taylor Peterson, mother of the claimant, but that he had rejected this claim in its entirety.
The statement thus far made gives a general picture of the condition of Lars Peterson's estate at the time of, and immediately following, his death. Before considering in detail the intervening litigation and the various transactions through which the estate was consumed, we shall anticipate the ultimate result by referring briefly to the final report which is here under attack.
L.A. Peterson, with the assistance and counsel of his attorney, James C. McKnight, administered the estate of his father, Lars Peterson, until his own death on October 17, 1937. Thereafter, on December 21, 1937, his half-brother, C.A.J. Taylor (a full brother to the *Page 697 
above-mentioned Neola Taylor Higgins) was appointed administratorde bonis non of the residue of the estate of Lars Peterson. At about that same time, Taylor appears also to have been appointed administrator of L.A. Peterson's estate.
On November 1, 1938, C.A.J. Taylor filed his final report in the estate of Lars Peterson. He gave a detailed account of the actions of L.A. Peterson as administrator, and of himself as administrator de bonis non, in dealing with the property of the estate. Although his figures are inaccurate and often contradictory, we will accept them now for what they are worth, subject to any revision upon further proceedings before the trial court.
The final report states that L.A. Peterson, during his administration of his father's estate, received, after deducting commissions to his rental agent, a total rental income from the properties of the estate amounting to $287,151.20 (although the itemization of the incomes from the respective properties yields a total of $250,212.72). The report recites the further receipt of $39,822.86, made up of the cash and note items in the inventory, the proceeds of the sale of one of the apartment houses, and money obtained by borrowing on the security of the property of the estate. On the basis of these figures, therefore, the total income received by L.A. Peterson, as administrator, was $326,974.06 (although Taylor's report gives the total as $326,978.90).
During this same period, according to the report, the expenses of the estate amounted to $258,876.58, including the payment of claims allowed against the estate, an advance to the Lion Oyster House in an effort to conserve the estate's interest therein, the cost of operating the apartment houses and of maintaining the other properties of the estate (taxes, mortgage payments, insurance, repairs, etc.), and the expenses of *Page 698 
administration, inclusive of the administrator's fees. Over the period of L.A. Peterson's administration, therefore, the estate had a net income of approximately $68,097.48, although the unreliability of nearly all the figures from which this result is obtained must be remembered.
The estate, however, is far from being in the sound condition reflected by the figures concerning its initial value and its subsequent earnings. On the contrary, the record reveals a steady dissipation of the assets of the estate, together with a serious depreciation in the value thereof. Referring again to the inventory made in 1925, we are now confronted with this startling situation: The Capitola Apartments have been sold to a third party; the Park (formerly Ingomar), Bristol, and Bellevue Apartments, and the two part lots in Denny's Addition have been transferred to the administrator's attorney in partial satisfaction of his claim for legal services; the lots in Denny-Fuhrman's Addition and in Pontius Addition have been lost through the foreclosure of mortgages placed thereon by L.A. Peterson in the course of administration; the household articles have been turned over to Mr. McKnight in payment of certain costs advanced by him; the Cadillac automobile was used by L.A. Peterson until it became worthless; part of the jewelry was disposed of by L.A. Peterson in some way not accounted for, but the greater part of it was sold to Mr. McKnight at a price of five hundred dollars and that amount credited against his fees; the stock in the Lion Oyster House lost all its value; the bond and the stock in the Community Hotel Corporation, which proved to be of little worth, were sold by L.A. Peterson and the proceeds used by him; the appraisement of the Cave Mine as worthless proved correct; and the money as inventoried, together with the proceeds of the Miller note and the balance of the *Page 699 
net income of the estate, was appropriated by L.A. Peterson to his own use and no accounting thereof was ever made. As a result, Lars Peterson's estate is now allegedly bankrupt, with James C. McKnight claiming that $3,568 of his fee as attorney is still unpaid.
Having reviewed the condition of the estate at the time of Lars Peterson's death and its greatly altered status today, we now come to consider the events which, during the intervening years, have produced this change of circumstance. These events may be roughly classified, chronologically and subjectively, as follows: (1) litigation involving the property of which Lars Peterson died possessed; (2) matters connected with the allowance of attorney's fees to Mr. McKnight; (3) proceedings incidental to the claim of Mina Quillin, one of the objectors and respondents herein; (4) matters arising in connection with the claim of the National Bank of Commerce; and (5) steps taken in satisfying Mr. McKnight's claim for his legal services.
Shortly after L.A. Peterson had been appointed general administrator of the estate of Lars Peterson, Neola Taylor Higgins (who seems then to have spelled her name "Neaola") on October 17, 1924, filed in the probate department of the superior court for King county her application for the appointment of one Clara Fitzpatrick as administratrix of the estate of the petitioner's mother, Mary Taylor Peterson, who had died in March, 1898, and whose estate had never been probated. The petition alleged that Mary Taylor Peterson had left an estate consisting of real and personal property of the probable value of $345,000. That proceeding was brought and waged by the petitioner, Neola Taylor Higgins, upon the theory that all the property which L.A. Peterson was seeking to administer as belonging to the estate of Lars Peterson actually belonged, in fact and in law, to her and the estate of her deceased mother *Page 700 
jointly, for the reason that it had all been acquired with the earnings of the San Francisco Oyster House which, it was alleged, was a business owned and operated by the petitioner and her mother during the latter's lifetime, but conducted by Lars Peterson after petitioner's marriage.
The application was denied by the probate court and, upon appeal to this court, in the first case above cited, In rePeterson's Estate, 137 Wn. 137, 241 P. 964, the order denying the application was affirmed, on the grounds (1) that there was no evidence that, at the time of Mary Taylor Peterson's death, there was in existence any real or personal property belonging to her or in which she had any interest, and (2) that, if the petitioner, Neola Taylor Higgins, had any right or claim against the estate of Lars Peterson, such right could be enforced by a proper proceeding in the administration of his estate, or by an original suit against the proper parties interested in that estate. That case was decided by this court on January 4, 1926.
Anticipating the result of that litigation, and pending the appeal therein, Neola Taylor Higgins filed a claim against the estate of Lars Peterson in the sum of $234,666.66. Upon its rejection by the administrator, she and her husband, on May 6, 1925, brought suit against L.A. Peterson, individually and as administrator of his father's estate, upon three causes of action, to recover that amount. Of that sum, $176,000 was claimed as the individual share of Mrs. Higgins in the profits of the above-mentioned San Francisco Oyster House, while the remaining $58,666.66 was claimed, in a second cause of action, to represent her one-third interest in the other half of the profits of that business owing to the estate of her deceased mother. In a third cause of action, they sought to recover the $176,000 on the further theory that Lars Peterson had left a will *Page 701 
in which he had devised and bequeathed to Neola Taylor Higgins one-half of all his property, but that L.A. Peterson, coming into possession of the will, had destroyed it. A judgment dismissing that action was affirmed by this court on February 7, 1929, in the second of the four cases listed above, Higgins v. Peterson.150 Wn. 620, 274 P. 186.
As a consequence of those two lawsuits, L.A. Peterson had, in the early part of 1929, substantiated his father's title to the property of which the latter died possessed, had established his own status as the decedent's sole heir, and had definitely eliminated Neola Taylor Higgins as a rightful claimant of any interest in that estate. Furthermore, by that time all the claims against the estate of Lars Peterson had been paid, except that of the state of Washington for inheritance tax, and there was every reason for the prompt closing of the estate. The administrator took no steps in that direction, however, and the record discloses no activity by his attorney toward that end.
The next event of importance in connection with the estate of Lars Peterson occurred almost three years later, on December 22, 1931. On that date, L.A. Peterson filed a motion, supported by his oath and a lengthy affidavit by James C. McKnight itemizing his legal services to the estate, requesting an order fixing his own fee as administrator and that of Mr. McKnight as his attorney, as well as the fees of the appraisers of the estate. On the next day, after hearing certain testimony, the judge of the probate court (who is now deceased) fixed the fees of L.A. Peterson and James C. McKnight at twenty-five thousand dollars each, in addition to the previous allowances mentioned above. Since each of them had already been allowed three hundred dollars for his services in connection with the special administration and an additional thousand dollars upon *Page 702 
approval of Peterson's first report as general administrator, they were each allowed a total of $26,300 for their services to the estate. L.A. Peterson paid himself his fee in cash, but the more complicated method pursued in paying Mr. McKnight's attorney's fee remains to be considered and will occupy the greater part of our attention upon this appeal.
First, however, it will be necessary to outline certain events growing out of the claims of two creditors, not of the estate of Lars Peterson, but of L.A. Peterson personally. On July 2, 1927, L.A. Peterson, together with certain others, became indebted on a note for eight hundred seventy-five dollars executed to one Chandos Garner, whose assignee, Mina Quillin, is one of the objectors to the final report in Lars Peterson's estate and a respondent herein. Garner brought action on his claim in 1934, and judgment in his favor was signed March 8th of that year, but was not entered until August 9, 1935. On October 21, 1935, an order was issued in proceedings supplemental to execution on Garner's judgment, which order provided that, on distribution of the estate of Lars Peterson, any interest distributed to L.A. Peterson should, without delivery to the latter in his personal capacity, be turned over to the sheriff to be applied by him on the Garner judgment. The order further directed that L.A. Peterson be restrained from transferring, encumbering, selling, or in any manner dealing in or affecting his interest in Lars Peterson's estate prior to its final distribution, unless the written consent of Chandos Garner were first obtained. The order recited, however, that it should not affect the orderly administration of the estate, but that L.A. Peterson, as administrator, should give Garner's attorney notice of the filing of his final account. The Garner judgment, together with the security afforded by the supplemental order, was subsequently assigned to Mina *Page 703 
Quillin and now serves as the basis for the latter's status as objector to the final report of the administrator de bonis non
of Lars Peterson's estate.
On February 3, 1925, L.A. Peterson, in his personal capacity, borrowed five thousand dollars from the National City Bank of Seattle, giving his note secured by a warranty deed conveying the two half-lots in Denny's Addition (items 4 and 5 in the inventory set out above). Thereafter, on September 29, 1925, he executed, with one T.W. Wade, a joint and several note for six thousand dollars to the same bank. Both notes were renewed from time to time, the last renewals being made in the summer of 1930.
In 1932, the National Bank of Commerce, successor to the National City Bank, brought suit on the two notes and recovered judgment thereon. In the judgment, the deed given to secure the first note was construed to be a mortgage of L.A. Peterson's interest in the lots therein described, and it was decreed that the mortgage be foreclosed, but that L.A. Peterson, as administrator, should nevertheless retain possession of the real estate until the estate was closed. The judgment declared the mortgage to be inferior to the administrator's right to sell the property for the purpose of paying the expenses of administration, including all allowances made to the attorney for the estate. The judgment also provided that the interest of L.A. Peterson, as heir, should be sold and the proceeds applied against the indebtedness owing the bank. The judgment thus obtained by the bank was affirmed by this court on December 10, 1934, in National Bank of Commerce v. Peterson, 179 Wn. 638,38 P.2d 361, which is the third case of those mentioned in the early part of this opinion. In that appeal we took note of the manner in which the administrator had been conducting the affairs of the estate and said: *Page 704 
"In passing, we wish to observe that our probate statute, Rem. Rev. Stat., § 1517 [P.C. § 9885], makes it the duty of every administrator to settle the estate in his hands as rapidly and as quickly as possible without sacrifice to the estate. We are powerless, as the trial judge in this case probably also felt, to compel more speedy action on the part of the administrator, as directed by the statute, within any specified time. He seems, however, to have been managing the estate as if he were the sole owner, or at least under a nonintervention will giving him sole authority. This last is, of course, not true. There seems to be no reason why the estate should not be settled."
That was seven years ago, and still the estate has not been closed.
After the decision in that case, the bank on February 2, 1935, caused L.A. Peterson's interest in the two lots in Denny's Addition to be sold under special execution, and itself bought in that interest for four thousand dollars, to be credited on its judgment on L.A. Peterson's separate note. Then, on March 16, 1935, the bank caused L.A. Peterson's interest in the Park, Capitola, Bristol, and Bellevue Apartments to be sold, and itself bought in that interest for $5,500, to be credited on its judgment on the joint and several note. The sheriff issued to the bank two certificates of purchase covering these various properties, and the sales were subsequently approved by the court.
We come now to a series of transactions through which Mr. McKnight's claim for legal services was in part satisfied. On November 20, 1935, an agreement was entered into by the National Bank of Commerce, L.A. Peterson, individually and as administrator, and James C. McKnight, individually and as attorney for the estate. This agreement recited the bank's recovery of judgment against L.A. Peterson and the steps taken pursuant thereto, and stated that L.A. Peterson was *Page 705 
contemporaneously accepting an offer for the purchase of the Capitola Apartments by one Moses Toivonen at a price which would net nine thousand dollars in cash and a sixty-day note for two thousand dollars. The agreement further noted that McKnight had an unpaid claim for his attorney's fees amounting to $26,300, and that L.A. Peterson desired to pay him three thousand dollars in cash and also to deliver the two thousand dollar note to him, in partial satisfaction of his claim. It was then recited that for five thousand dollars the bank had agreed to assign to McKnight its certificates of purchase of L.A. Peterson's interest in his father's estate, together with its deficiency judgment against L.A. Peterson, and that the latter, as administrator, had agreed to pay the state inheritance tax from the proceeds of the sale of the Capitola Apartments and to apply the balance toward the payment of taxes on the lots in Denny's Addition. On the basis of the foregoing recitals, it was formally agreed that, upon confirmation of the sale of the Capitola Apartments, L.A. Peterson should pay five thousand dollars to McKnight in the manner specified, that the latter should then exchange that payment for the bank's certificates and judgment, and that the administrator should thereupon dispose of the rest of the proceeds of the sale of the Capitola Apartments as outlined above.
On December 2, 1935, one of the judges of the superior court (not the probate judge) approved the sale of the Capitola Apartments. On December 5th, the bank and McKnight consummated their agreement whereby McKnight acquired all the bank's interest under its judgment and certificates of purchase, and on the next day L.A. Peterson paid to the state an inheritance tax of $2,172.
At the time of the agreement outlined above, the time *Page 706 
for redemption from the two sheriff's sales to the bank was due to expire in three or four months. Mr. McKnight offered to testify, and now claims, that the agreement was entered into at L.A. Peterson's request, and that prior thereto he and Peterson had orally agreed that, in the event he, McKnight, should purchase the bank's claim, the time for redemption from the sales should be extended for one year, upon the condition that Peterson should protect McKnight in the matter of his fee by commencing its payment and by promptly petitioning the court for an order permitting him as administrator to sell all the property of the estate and authorizing McKnight to become a purchaser thereof.
We come now to the crux of the present dispute, namely, the transactions by means of which the properties of the estate of Lars Peterson were disposed of by transfer. As has already been indicated, certain of the vacant lots were lost through mortgage foreclosure, and the Capitola Apartments were sold to a third party. The remainder of the real property, together with an appreciable amount of the personalty, came into the possession of Mr. McKnight, the attorney. We are presently concerned with these transfers to Mr. McKnight.
It is to be remembered that Mr. McKnight had been allowed fees totaling $26,300, on which the only payment he had received was the sum of five thousand dollars paid to him pursuant to the tripartite agreement previously mentioned. Soon after the consummation of that agreement, L.A. Peterson, on December 12, 1935, filed a motion for an order directing him to sell the lots in Denny's Addition and the Park, Bristol, and Bellevue Apartments at private sale. An order to that effect was issued on the same day by another judge of the superior court (still not the probate judge), who had apparently had no prior acquaintanceship with the affairs of the estate. That order further provided that *Page 707 
the time of notice of sale might be shortened and that McKnight might become a purchaser at such sale, with the right to apply his fee as payment for any property so purchased. On the same day, on L.A. Peterson's motion, the same judge confirmed the sale of certain of the jewelry of the estate to McKnight for a five hundred dollar credit against his fee.
Thereafter, on December 28, 1935, L.A. Peterson filed a report of the sale of the lots in Denny's Addition to McKnight for ten thousand dollars, to be paid by his crediting $7,232 against his fee and assuming encumbrances, amounting to $2,768, which had been placed upon the property during the course of administration. In that report, Peterson also asked that the sale be confirmed. On January 8, 1936, Chandos Garner filed objections to this sale on the grounds that the price was inadequate, that the allowance of the attorney's fee to McKnight was ex parte, and that the attorney had already collected sums in excess of any proper allowance. Apparently, however, these objections were never brought to the attention of McKnight or of the court, and, on January 10, 1936, the sale was approved by the judge then sitting in probate matters, the successor to the probate judge who had entered the order fixing the fees of Peterson and McKnight.
Then, again, on June 10, 1936, Peterson reported, and asked confirmation of, the sale of the Park, Bristol, and Bellevue Apartments to McKnight for an aggregate price of $55,468.09, to be paid by his crediting ten thousand dollars against his fee and assuming encumbrances totaling $45,468.09. On June 22, 1936, still another superior court judge (not the probate judge) confirmed the sale.
Mr. McKnight has thus received five thousand dollars in cash (with which he obtained from the National Bank of Commerce an assignment of its certificates of *Page 708 
purchase and its judgment as mentioned above), five hundred dollars in the form of jewelry, and $17,232 in real estate, representing the value over and above encumbrances of property of the estate transferred to him, or a total of $22,732. He therefore claims that $3,568, the balance of his fee of $26,300, is still owing him, although he does not press for its collection, since the estate is bankrupt if the foregoing transfers are held valid.
It should be emphasized here that L.A. Peterson's course and manner of conducting the affairs of Lars Peterson's estate did not go unchallenged. Heroic efforts were made either to oust him from his official position as administrator or else to circumscribe his activities, even though all the details of his misconduct were apparently not then actually known to the complaining parties. All such efforts, however, were without avail. As early as March 10, 1927, Neola Taylor Higgins had filed a motion for the removal of L.A. Peterson as administrator, but her motion was denied. Prior to September 26, 1934, the state of Washington had filed a petition for his removal, and on that date obtained an order for an accounting. At the time of the above-mentioned agreement entered into by L.A. Peterson, James C. McKnight, and the National Bank of Commerce, the bank had pending a similar petition for Peterson's removal and for an accounting in the estate of Lars Peterson. Both of these removal proceedings were abandoned after the consummation of the agreement with the bank. On December 19, 1935, Chandos Garner, as a judgment creditor of L.A. Peterson individually, filed a petition for the removal of the latter as administrator, for a final accounting in the estate of Lars Peterson, and for an order restraining L.A. Peterson from disposing of any of the funds of the estate before final settlement thereof. L.A. Peterson *Page 709 
demurred to that petition, his demurrer was sustained, and the petition was dismissed with prejudice on May 29, 1936, by the same judge who later approved the sale to McKnight of the three apartment houses. No appeal from that decree was ever taken.
The administration of Lars Peterson's estate finally entered its last phase in the latter part of 1938, when C.A.J. Taylor, as administrator de bonis non of that estate, filed his final report. To that report Neola Taylor Higgins and Mina Quillin, assignee of Chandos Garner, filed their objections. On January 23, 1939, the probate judge granted Taylor's amended motion to strike the objections and also sustained his demurrer thereto, and on March 14, 1939, entered a decree approving his final account. Both objectors appealed, and the probate court's decree was reversed by this court in In re Peterson's Estate, 6 Wn.2d 294, 107 P.2d 580, which is the last of the four cases cited in the early part of this opinion. That appeal, however, primarily involved merely the question of the objectors' standing in court to question the final account, and the case was remanded with direction to pass upon the objections on the merits.
On remittitur, the cause was heard upon the objections previously filed, and a lengthy trial was had before a judge of the superior court who had not participated in any of the previous proceedings in this estate. On June 16, 1941, the court trying the matter entered an order disapproving Taylor's final report in the estate of Lars Peterson, removing Taylor as such administrator de bonis non and also as administrator of the estate of L.A. Peterson, annulling the order of December 23, 1931, by which the fees of L.A. Peterson and James C. McKnight had been fixed at twenty-five thousand dollars each, and allowing McKnight alone an aggregate fee of only ten thousand dollars. The court also held *Page 710 
that McKnight took the assignment of the certificates of purchase and the deficiency judgment of the National Bank of Commerce, as well as the conveyances and transfers of the real and personal property of Lars Peterson's estate, in trust for that estate, and accordingly vacated all the orders previously entered approving such conveyances and transfers. McKnight was further directed to reconvey, and deliver possession of, such properties to the estate and to make an accounting of the income and expenses of operation of the properties while held by him, but at the same time he was allowed an additional fee of one thousand dollars for managing the properties during that period.
C.A.J. Taylor's motion for a new trial was denied, and he and McKnight have appealed. Mina Quillin, Neola Taylor Higgins, and Thomas L. Burns, who was appointed administrator de bonis non
in place of Taylor, have appealed from so much of the order as allowed Mr. McKnight an attorney's fee of ten thousand dollars and a fee of one thousand dollars for managing the properties transferred to him.
On June 28, 1941, the trial court, on the petition of Mina Quillin and Neola Taylor Higgins, ordered that its decree of June 17, 1941, in the matter of the estate of Lars Peterson, be made of record in the probate of L.A. Peterson's estate, and that C.A.J. Taylor be removed as administrator of that estate. Taylor has also appealed from that order.
Before entering upon a discussion of the merits of the case, we desire to call attention to a number of instances of noncompliance by the parties with the rules of this court.
[1] Appellant's brief contains no statement of the case, and the briefs of both parties are faulty in that they do not make adequate references to the transcript, *Page 711 
the statement of facts, and the abstract. Rule of the Supreme Court XVI, 193 Wn. 23-a, provides:
"Briefs . . . shall contain a clear statement of the case so far as deemed material by the party, with references to the transcript, the statement of facts or bill of exceptions, and also to the abstract in all instances where an abstract is required."
The statement of facts in this case covers two hundred ninety-eight pages, and the transcript, containing eighty-three instruments, covers three hundred thirty-four pages. Counsel have not given us the aid which the rule enjoins and which we expect. See Drainage Dist. No. 2 v. Everett, 171 Wn. 471,18 P.2d 53, 88 A.L.R. 123.
[2] A more glaring and troublesome fault on the part of appellants appears in the two volumes of the transcript which they prepared. Rule of the Supreme Court VIII(2), 193 Wn. 9-a, provides:
"Transcripts may be printed or typewritten. If typewritten, the paper shall be of good quality of the size of legal cap, and only a black record ribbon shall be used. . . . The transcript shall be free from interlineations and erasures, and shall be paged and prefixed with an alphabetical index of its contents, specifying the page of each separate paper, order, or proceeding."
In this instance, the transcript was typewritten, but practically every requirement of the rule was ignored. The paper was to a great extent of poor quality; carbon copies of different colors appear throughout; some of the reading matter is hardly legible; interlineations, erasures, and eradications are frequent; the indices are not alphabetically arranged; and there is no semblance of order or chronology in the listing of the various instruments. The entire compilation is a jumbled mass, and to get an intelligent familiarity with its contents has required an inordinate amount of time. We *Page 712 
mention these matters here, not because it will do any good in this case, but rather to emphasize the fact that this court expects its rules to be followed with at least a reasonable degree of observance. If a case is worth appealing, it deserves to be presented in an orderly and proper fashion.
We will now take up appellants' assignments of error, sixteen in number. These we will consider, not in the order given in appellants' brief, but rather in groups, according to their subject matter and in what we conceive to be a logical sequence.
[3] It is first contended that the trial court erred in holding that it had jurisdiction over Mr. McKnight personally and in making an order affecting him and his property. In support of this position, however, it is merely stated that no citation or process was ever served upon McKnight to make him a party to the proceedings, and that he asked for no affirmative relief nor in any other manner submitted himself to the court's jurisdiction.
Although this argument might seem to possess a certain technical merit, it can be readily disposed of by reviewing Mr. McKnight's activities in connection with this litigation. The record makes it obvious that C.A.J. Taylor, the administrator debonis non, is only nominally a party to this proceeding, even though his removal is expressly sought. The real dispute here is clearly between the objectors, Quillin and Higgins, on the one hand and McKnight on the other. The objections filed by the former are leveled against actions by the latter and by L.A. Peterson in the administration of Lars Peterson's estate. The end sought to be achieved in this proceeding, as evidenced by objectors' prayer for relief, is simply to compel McKnight to restore all or a part of the property which has come into his hands. *Page 713 
After demurrers to the separate objections of Mina Quillin and Neola Taylor Higgins had been originally sustained, as set forth above, they served a notice of appeal directed, among others, to "James McKnight, individually and as attorney, for said C.A.J. Taylor." Service was acknowledged by McKnight "individually and as attorney for C.A.J. Taylor in the capacities named herein." The respondents' brief on that appeal was devoted almost entirely to arguments designed to buttress Mr. McKnight's own position, and he personally paid the expenses of that appeal. Now, as the case comes to this court once more, Mr. McKnight has again filed a brief which clearly is submitted in his own behalf rather than in behalf of Taylor, his nominal client. If the court's decree be reversed now, Taylor will receive no real benefit. The entire profit from such a result would redound to McKnight, who would, in effect, be confirmed in his possession of properties formerly belonging to the estate.
True, Taylor's final report might ultimately prevail if all of appellants' contentions were here sustained, and he might be reinstated as administrator de bonis non, but the record clearly discloses that the report is his in name only, and that his administration has been equally factitious. The report was prepared by McKnight and was signed by Taylor as a pure matter of form, for he admits an almost complete ignorance of the affairs of the estate. Moreover, during the six-day trial of this cause in the superior court, McKnight testified at length in justification of his fee as allowed, and in support of the various transfers of the properties of the estate in which he participated. Taylor was the only other witness, but his testimony was largely in support of McKnight's interests. All this makes it evident that McKnight, not Taylor, was the person interested in sustaining the final report below, *Page 714 
and that he is the one now concerned with overturning the trial court's adverse decree.
On a hearing of objections to the confirmation of the final report of an administrator or executor, the latter's attorney is, in the very nature of things, a "party" to the proceeding and is subject to the jurisdiction of the court whenever, and to the extent that, his fee is attacked or some act of his in the course of the administration is questioned, provided, of course, that the attorney is present at the hearing and is allowed an opportunity to justify himself. All matters pertaining to the administration of the estate are then before the court, and it has authority to enter any orders which may be necessary to the proper closing of the estate. If an order affecting the attorney for the administrator is necessary to that end, the court has jurisdiction over him for that purpose, subject only to the qualification previously mentioned.
In the instant case, McKnight's position under the rule just stated is not altered by the fact that, upon learning of the adverse character of the trial court's memorandum decision, he filed an instrument in which he purported to appear, or to have appeared, specially as an individual for the purpose of objecting to the assumption of jurisdiction over him in his personal capacity. His position as the real proponent of the final report had already been clearly established; he had been afforded a full opportunity to explain and defend his acts; and he will therefore not now be heard to assert a purely technical claim of immunity from the jurisdiction of the court. For a somewhat different problem involving jurisdiction to alter the fee allowed to the attorney for a personal representative, see In re Bradley'sEstate, 184 Wn. 642, 645, 52 P.2d 333, 335.
[4, 5] Appellants next contend that the objectors, *Page 715 
respondents herein, had no standing or right to question the allowance of attorney's fees made in 1931. As already shown, the objections which were interposed by these respondents were directed to the final report filed by the original administratorde bonis non. The identical contention now made by appellants was urged by them, and was decided adversely to them by this court, in In re Peterson's Estate, 6 Wn.2d 294,107 P.2d 580.
In that case, these appellants (respondents there) argued that, since the petition of Chandos Garner (assignor of Mina Quillin, respondent herein) filed December 19, 1935, seeking the removal of L.A. Peterson as administrator, requesting the revision of the fees allowed the administrator and his attorney, and asking for an order restraining the administrator from distributing to himself personally any of the property of Lars Peterson's estate, was dismissed with prejudice, and since no appeal was taken from the order of dismissal, therefore the question as to whether Garner had any interest in the estate of Lars Peterson becameres judicata. In answer to that argument, this court pointed out, in that case, that Garner's right to petition the court derived from the order in supplemental proceedings referred to above, which provided, among other things, that it was not to affect the orderly administration of the estate, but that L.A. Peterson should nevertheless be required to give Garner's attorney notice of the filing of his final account. Upon that characterization of Garner's derivative right, this court held (1) that the order preventing Garner from interfering with the course of administration was not an adjudication that he, or his assignee, Mina Quillin, could not question the final account when made, and (2) that, under those circumstances, Garner had sufficient interest in the estate to permit him or his successor *Page 716 
in interest to file objections to the account. We held, further, in that case, that, since Neola Taylor Higgins, the other respondent herein, is an heir of L.A. Peterson (who was, in turn, the sole heir of Lars Peterson), she was an interested party and properly entitled to file objections to the final report in the estate of Lars Peterson. See In re Bradley's Estate, 184 Wn. 642,52 P.2d 333. Upon the authority of In re Peterson'sEstate, supra, we hold against the contention now made by appellants.
[6] The next contention advanced by appellants is that the order of December 23, 1931, fixing the fees of the administrator and of his attorney, is res judicata, not only as to the legality of that order, but also as to the amounts of the fees allowed, and is therefore now immune from attack.
If the order were merely an interim order, as it would be had it simply purported to fix a partial allowance of fees, it would be subject to vacation or modification on final accounting. This matter of interim orders in probate has recently been before this court, with particular reference to the nature and conclusiveness of periodic reports made by an administrator. Inre Krueger's Estate, 11 Wn.2d 329, 119 P.2d 312. In that case, we held that, in view of the purposes of such periodic reports and the informality with which they are customarily rendered and approved, the orders approving them cannot be regarded as conclusive of the matters contained therein, as against interested parties who had no notice of the hearings at which such reports were confirmed. That case not only held that such orders are merely prima facie correct, but also specifically recognized the right of interested parties without notice of the hearings to interpose objections on the final accounting and to *Page 717 
demand the reexamination of matters previously approved in periodic reports.
This rule is eminently wise and just, and the reasoning and considerations of policy upon which it rests are equally forceful when applied to orders for partial allowance of fees. The ordinary procedure for obtaining such an order is for the personal representative to move the court for an allowance, on account, of fees to himself and his attorney, without notice to other interested parties, and for an ex parte order to be entered to that effect. Because of the lack of notice, such an order should not be, and is not, conclusive in any way, and, under the rule of the Krueger case, it is subject to vacation or modification upon final accounting, at which time the whole question of the worth of the entire services of the personal representative and of his counsel is fully considered and a final allowance of fees is made. Compare In re Thomas' Estate,140 Wn. 296, 248 P. 804.
[7] The order with which we are here concerned, however, was not an interim order, nor did it partake of the nature of such an order. It purported to be a final order fixing the entire allowance for fees over and above what had already been allowed some years before. No such order should have been made, nor should ever be made, prior to the final accounting, for it is then that all the interested parties are given notice according to the statute and have the right to be heard upon all matters affecting the administration and distribution of the estate. When a court enters an ex parte order purporting to fix fees finally for the whole period of administration, it is doing something which partakes of the nature of an order approving the final report, and therefore such action should be taken only on a final accounting. Obviously, an order such as the one made in this case cannot be binding upon interested *Page 718 
parties who were given no notice of its proposed entry and no opportunity to be heard relative to the matters contained in it. The reasons given in the Krueger case, supra, in connection with interim orders apply with equal, if not greater, force to final orders, and such as are final in their nature.
As bearing upon this general question, compare In re Perry'sEstate, 168 Wn. 428, 12 P.2d 595, and In re Doane'sEstate, 64 Wn. 303, 116 P. 847. For cases from other jurisdictions recognizing the inconclusiveness of orders, entered without notice, fixing fees and allowing other expenses, seeSouter v. Fly, 182 Ark. 791, 33 S.W.2d 408; Beattie v.Hewitt, 114 Conn. 689, 159 A. 890; In re Estate of Durey,215 Iowa 257, 245 N.W. 236; Brackett v. Fuller, 279 Mass. 62,180 N.E. 664; McMahon v. Ambach Co., 79 Ohio St. 103,86 N.E. 512; Mills' Estate, 40 Ore. 424, 67 P. 107; Anderson v.Armstrong, 132 Tex. 122, 120 S.W.2d 444.
Since the order here under consideration purported to be a final order and not a mere interim order, it is not to be treated as though it were prima facie correct and subject only to vacation or modification upon final accounting. On the contrary, it is absolutely void for lack of jurisdiction in the court to make such an order ex parte and without notice. In reSullivan's Estate, 36 Wn. 217, 78 P. 945. Accord, Colkettv. Hammond, 101 Wn. 416, 172 P. 548. It is clear that an exparte order approving a personal representative's final report, including the allowance of fees therein, would be utterly void if made without giving the notice required by Rem. Rev. Stat., § 1532 [P.C. § 9794]. Since an order fixing fees, such as was entered in this case or in the Sullivan case, supra, purports to be just as final within its limited sphere, it must be held to be equally without effect if the statutory notice *Page 719 
above mentioned, or actual notice in lieu thereof, is not given.
It is true, as stated by appellants, that L.A. Peterson was the sole heir of his father's estate, that all of his father's creditors had been paid in full, and that all claims in connection with the latter's death and burial had been satisfied, so that it might seem that there was no one to whom notice could be required to be given. However, the order could not become conclusive in rem, as appellants claim it did, unless the statutory constructive notice was given.
Besides that, the state of Washington was concerned in the determination of fees because it had a claim for inheritance tax, and, of course, the amount of the tax would be affected by the amount of the fees. The state was not given notice of the hearing on December 23, 1931, and for that reason, also, the order was void. The fact that the state has never questioned the fees allowed is of no avail to appellants, for if the order was void when entered, the state's failure to object could not infuse life into it. In the present action, two persons who have been adjudged competent to file objections to the final report of the administrator de bonis non have challenged this void order, and the court was therefore required to set it aside.
Appellants also advance another argument with respect to respondents' right to question the allowance of fees made in 1931. They point out that L.A. Peterson lived for nearly six years after that allowance was made, and that during that time he neither appealed from the order of December 23, 1931, nor at any time questioned its validity in any way. They therefore claim that he would be estopped to challenge that order if he were now alive, and that as a result the present objectors, who claim through him *Page 720 
as heir and creditor respectively, are similarly estopped from attacking the allowance of fees.
[8] This argument may have some technical validity as to Neola Taylor Higgins, who claims only as an heir of L.A. Peterson. See Lewis v. Hill, 61 Wn. 304, 112 P. 373. A man owes no legal obligation to his prospective heirs to conserve his wealth by wise management in order that, if he makes no other disposition of his estate, it will ultimately pass to them. He has the privilege of squandering all of his property or of disposing of it in any way he sees fit, either during his lifetime or by transfer effective at his death. His control over his property is as absolute as to his next of kin as it is with respect to the rest of the world.
[9] Therefore, since L.A. Peterson chose to move the court for the allowance of an exorbitant fee which would materially reduce the body of the estate passing to him as sole heir, and thereafter at all times participated and acquiesced in the transfer of property of the estate in payment thereof, his heirs would seem to be estopped from challenging the amount of that fee at this time, although upon his death, as was held in In rePeterson's Estate, 6 Wn.2d 294, 107 P.2d 580, they became entitled, as a general matter, to file any other objections they might have to the final report of the administrator de bonisnon of his father's estate. But notwithstanding the possibility that Neola Taylor Higgins may be estopped, as an heir of L.A. Peterson, to complain of the size of the attorney's fee which the latter induced the court to allow, she is still competent to adduce information which, as we shall presently see, requires the court to act of its own motion. She may therefore succeed in acquiring for herself the very same benefits she has been held estopped to claim. But, if this is so, it results incidentally from her activities as a mere friend of the court *Page 721 
and not directly from her status as heir of L.A. Peterson.
The claim of Mina Quillin, a creditor, however, stands upon a different footing. By definition, a debtor owes an obligation to his creditors, and any wilful act which unduly depletes the estate to which they must look for satisfaction of their claims violates that obligation. Although Peterson's participation in the hearing on December 23, 1931, which resulted in the mistaken allowance of an excessive fee to McKnight, did not constitute a legal wrong to Neola Taylor Higgins, it did constitute such a wrong as to Chandos Garner, to whose rights Mina Quillin has since succeeded. As to Mrs. Higgins, his actions simply reduced a fund in which she had a mere expectation of obtaining an interest at some future time; but the effect as to Garner was to prevent the prompt closing of the estate and to diminish the interest which properly would have passed to L.A. Peterson personally, and against which his creditors could have had direct recourse.
In other words, if a fee of only ten thousand dollars had then been properly allowed and had the estate thereafter been promptly closed, Peterson's interest in his father's property would have become complete (with the right to possession and to the enjoyment of the rents and profits supplementing the title acquired immediately upon his father's death), and his creditors could then have enforced their claims by levy of execution. Since his inheritance would have been at least fifteen thousand dollars larger because of the difference in the fee of his attorney, his creditors would have been that much more fully secured. His conduct in seeking a fee of twenty-five thousand dollars for McKnight was therefore not only a fraud upon the court, but a fraud upon his creditors as well. They consequently possess higher rights as against McKnight *Page 722 
than L.A. Peterson would have now enjoyed were he still alive, and since Chandos Garner and Mina Quillin have not been guilty of laches in prosecuting their claim, the latter is not now estopped by the conduct of their debtor.
[10] But the result would be the same in any event, for, even if Mina Quillin were also estopped from attacking the allowance of fees made in 1931, the court itself is not estopped and can of its own motion remedy its earlier mistake. The probate court is not merely a referee in a contest between private disputants. Instead, it is the agency primarily charged with the important function of administering decedents' estates and of distributing to the proper parties in each case the balance left after paying the debts of the decedent, the expenses of his last illness and funeral, and the expenses of administration. This is done through its own duly appointed officers, acting, except in the case of nonintervention wills, under the close supervision of the court.
Because of this peculiar position occupied by the probate court, it should accept direct responsibility for the proper administration of every estate. It may derive assistance from the activities of private parties having conflicting interests in the estate, but this fact should not be allowed to relieve it of the ultimate responsibility. And this obligation of the court is heightened because of the large number of proceedings incident to administration which are entirely ex parte, throwing upon the court the duty of safeguarding the rights of interested parties who are not present to do so for themselves.
As a result of this peculiar status of the courts in probate proceedings, if it becomes apparent during the course of administration that a mistake has been made at some earlier stage, the court should immediately *Page 723 
take steps to remedy the situation in so far as that is possible. So, in this case, when it was called to the court's attention that the 1931 order was entirely void, its only course was to vacate the order, as it did. Furthermore, it makes no difference whether or not the parties who brought this fact to the court's attention were legally entitled to complain of the void order. It is the court which takes the initiative in striking down the invalid order, and the source of the information inducing the action is not material. The court may even act on facts supplied by total strangers to the estate appearing as friends of the court. But whatever the source of its information, once the court has determined that the facts are as represented, it should of its own motion take the proper steps to correct the situation.In re Mignerey, 11 Wn.2d 42, 118 P.2d 440.
[11] Appellants further contend that the orders confirming the sales to McKnight are now res judicata as to the adequacy of the prices paid, the fairness of the sales, and all other objections which might have been offered against the entry of those orders. While their contention in this respect is not very specific, it presumably is based, so far as the real estate is concerned, on Rem. Rev. Stat., § 1504 [P.C. § 9986], which provides that an order confirming the sale of real property belonging to an estate shall be conclusive as to the regularity of all proceedings leading up to and including such sale and as to the fact of compliance with all statutory provisions and orders of the court relative thereto, and, further, that no conveyance pursuant to such an order of confirmation shall be open to attack upon any ground other than fraud.
This section of the statute cannot operate to immunize the particular transfers here in question against attack at this time and in this manner. By these transfers, *Page 724 
three in number, certain jewelry, together with the two half-lots in Denny's Addition and the Park, Bristol, and Bellevue Apartments, passed into McKnight's possession. All of these transactions were obviously based upon the order allowing fees, which has been found void for lack of jurisdiction, and the orders confirming the sales of the real estate expressly referred to that fee and required McKnight to execute and deliver receipts acknowledging part payment thereof to the extent of the agreed prices for the properties. It is clear that no such transfers to McKnight would have been confirmed by the court had it not supposed the order allowing that fee to be valid. The orders of confirmation were therefore induced, in large degree, by a mistake of fact so basic as to vitiate them entirely.
[12] Since the rights of no innocent third persons are concerned, it is our conclusion that McKnight took, and now holds, the property received from the estate under a constructive trust for the benefit of Lars Peterson's estate, or, more precisely, for the administrator de bonis non of that estate. While this case may not fit exactly into any of the established categories into which the cases where constructive trusts have been imposed are normally classified, still it comes well within the general purpose for which such trusts are created. That purpose has been well expressed by Mr. Justice Cardozo in Beattyv. Guggenheim Exploration Co., 225 N.Y. 380, 122 N.E. 378, as follows:
"A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee." *Page 725 
McKnight improperly acquired title to property belonging to the estate and is therefore equitably bound to return it.
Under a series of assignments of error, appellants next contend that the trial court erred in entertaining collateral attacks based upon evidence dehors the record, directed against the orders of sale of the real estate above mentioned and against the order fixing and allowing the original attorney's fee. It is asserted that all those orders have the force and effect of final judgments and cannot be set aside in these proceedings. The question thus presented is whether respondents' objections and the proceedings pursuant thereto constitute a direct attack or a collateral attack.
[13] A direct attack on a judicial proceeding is an attempt to avoid or correct it in some manner provided by law; and, correlatively, a collateral, or indirect, attack on such a proceeding is an attempt to avoid, defeat, or evade it, or to deny its force and effect, in some manner not provided by law. Van Fleet, Collateral Attack on Judicial Proceedings (1892) 4, 5, §§ 2, 3. See 7 Words Phrases (Perm. ed. 1940) 573 and 12 Words Phrases (Perm. ed. 1940) 448 for cases defining and illustrating collateral and direct attacks, respectively.
In 34 C.J. 520, Judgments, § 827, a direct attack is defined as follows:
"A direct attack on a judgment is an attempt to avoid or correct it in some manner provided by law, in a proceeding instituted for that very purpose, in the same action and in the same court, and the fact that other incidental relief is also asked is immaterial."
In the same section of the treatise just cited is given a definition of collateral attack which this court recently approved in Thompson v. Short, 6 Wn.2d 71, 106 P.2d 720, as follows: *Page 726 
"A collateral attack is an attempt to impeach the judgment by matters dehors the record, in an action other than that in which it was rendered; an attempt to avoid, defeat, or evade it, or deny its force and effect, in some incidental proceeding not provided by law for the express purpose of attacking it; any proceeding which is not instituted for the express purpose of annulling, correcting, or modifying such decree; an objection, incidentally raised in the course of the proceeding, which presents an issue collateral to the issues made by the pleadings. In other words, if the action or proceeding has an independent purpose and contemplates some other relief or result, although the overturning of the judgment may be important or even necessary to its success, then the attack upon the judgment is collateral."
[14] Within the definitions just given, the attack upon the orders under consideration constituted a direct, and not a collateral, attack. The express purpose of the attack was to avoid or correct those orders. The method of attack was by objections to the final report, as authorized by Rem. Rev. Stat., § 1533 [P.C. § 9795]. The attack was therefore made in the manner provided by law, for this statutory procedure clearly constitutes an appropriate method for seeking the invalidation of any void orders which may have been entered in the course of administering the estate. Furthermore, the attack in this instance was made in the original probate proceeding and in the same court, and the relief asked was not merely incidental nor collateral to the issues raised by the objections.
[15] Appellants have devoted a good deal of space in their briefs to the matter of the construction to be placed on the contract entered into on November 20, 1935, by Peterson, McKnight, and the National Bank of Commerce. We think that, inasmuch as the five thousand dollars with which McKnight purchased the bank's deficiency judgment against Peterson and its *Page 727 
certificates of sale of the latter's interest in his father's estate was paid to McKnight pursuant to the void order allowing his fee, the trial court correctly held that McKnight received such money as a constructive trustee and now holds the deficiency judgment and certificates of sale as such trustee.
Having thus disposed of the preliminary issues involving the right of the objectors to be heard on the merits at this time, having determined the status of the order fixing fees and the orders confirming sales to satisfy such fees, and having also determined McKnight's present status with reference to the property of the estate now held by him, we reach the central problem in this case, namely, the question of the amount of attorney's fees to be allowed McKnight. He contends that, even if respondents be now heard to object to the fees as originally allowed, still the sum then approved was reasonable and should now be confirmed in a new order allowing the same amount. The objectors, on the other hand, have cross-appealed from the allowance of any fee whatever, on the ground that the order of December 23, 1931, fixing fees was entirely vacated by the trial court and that no proper request was thereafter made for a new allowance of a fee, in compliance with Rule XX of the General Rules of the Superior Courts, 193 Wn. 64-a. Respondents further contend that, in any event, the ten thousand dollar fee allowed by the trial court is excessive.
[16] We take up, first, respondents' initial contention. It is true that Rule XX above mentioned provides that, before compensation shall be allowed to any administrator, guardian, or attorney in connection with any probate matter, the amount of compensation shall be definitely and clearly set forth in the application therefor, and all parties interested in the matter shall be given notice, as therein prescribed, of the amount *Page 728 
claimed. It is also true that there has been no formal compliance with that rule. However, the question of the value of McKnight's services was one of the central issues at the trial below, and there cannot possibly have been any doubt on anyone's part that McKnight intended to claim a fee of twenty-five thousand dollars, whether on the basis of the 1931 order or under a new allowance made in this action. All the interested parties were in court; they had full opportunity to be heard upon that question; and the court made its order after due consideration of the matter. The purpose of the rule was thus substantially achieved, and no one has been prejudiced by the fact that the rule was not strictly followed.
[17] We consider, next, the amount actually and finally allowed by the trial court. The fixing of fees in probate matters depends upon the particular facts of each case and is largely within the discretion of the trial judge. This court will not interfere with the latter's findings on that point unless there is a clear showing of abuse of discretion. In re Andrew'sEstate, 123 Wn. 546, 212 P. 1073; In re Levy's Estate,125 Wn. 240, 215 P. 811; In re Hart's Estate, 156 Wn. 255,286 P. 650; In re Fetterman's Estate, 183 Wn. 410,48 P.2d 638.
[18] In fixing the amount to be allowed as a fee for the attorney of a decedent's personal representative, the court should consider the amount and nature of the services rendered, the time required in performing them, the diligence with which they have been executed, the value of the estate, the novelty and difficulty of the legal questions involved, the skill and training required in handling them, the good faith in which the various legal steps in connection with the administration were taken, and all other matters which would aid the court in arriving at a fair and just allowance. *Page 729 Shufeldt v. Hughes, 55 Wn. 246, 104 P. 253; In reHolmgren's Estate, 189 Wn. 94, 63 P.2d 504; 2 Bancroft, Probate Practice (1928) 810, § 432; 24 C.J. 104, Executors and Administrators, § 542.
[19] In considering the value of an estate, the court should look to the actual value, and not merely to the appraised value.In re Johnston's Estate, 107 Wn. 25, 181 P. 209. If the value of the estate has changed during the course of administration, that prevailing at the time of final settlement controls the fixing of fees. Horton v. Barto, 17 Wn. 675,50 P. 587; In re Hagerty's Estate, 97 Wn. 491, 166 P. 1139. However, it would not be improper for the court to take into consideration the original value of the estate as affecting the attorney's responsibilities at that stage of the proceedings.
[20] The inventory and appraisement of 1925 showed a net value of $179,975.13. The trial court found that, at the time of the order fixing fees, the estate was, in fact, worth not more than seventy thousand dollars, and in the light of the estate's subsequent history it seems clear that this estimate was a generous one. We are satisfied that had the judge who originally fixed the fee at twenty-five thousand dollars known the true state of affairs at that time, he would not have allowed so exorbitant an amount. Without further reviewing the evidence touching the value of the attorney's services and the manner in which the administration has been conducted, we conclude that the amount finally fixed by the trial court represents, as nearly as we ourselves could fix it, the full value of the legal services rendered to the estate, and certainly we cannot say that the court abused its discretion in fixing that amount.
[21] Respondents further contend, on their cross-appeal, that, even if a fee was properly allowable, the *Page 730 
allowance should not have been made direct to the attorney as an expense of administration, but should have been made to the administrator de bonis non as an allowance for his attorney's fee. In support of this position, they cite a number of cases which they claim lay down such a rule. Upon examination, however, most of them are distinguishable on their facts, so that the question here raised was not even presented for decision therein. In only one of them, In re Sullivan's Estate, 36 Wn. 217,78 P. 945, is it specifically held that an allowance for attorney's fees cannot be made to the attorney, but must be made to the administrator or executor. That case was decided, however, before the enactment of our present statutory provision, Rem. Rev. Stat., § 1528 [P.C. § 9790], which declares that:
". . . In all cases where it is necessary for such executor or administrator to employ an attorney, such attorney shall beallowed such compensation as to the court shall seem just and reasonable." (Italics ours.)
This language, given an ordinary construction, would seem clearly to authorize the allowance of fees direct to the attorney if the court wishes to handle the matter in that way. It is true that in the Sullivan case, and even in cases decided since the enactment of the above statute just quoted, this court has held that no relationship exists between the attorney for the personal representative and the estate which the latter is administering. This may be true in terms of certain technical legal concepts, but it seems a needless abstraction. There is no agency or individual other than the official "personality" of the administrator or executor which can be pointed to as the "estate." In fact, if the term "estate" be construed as referring only to the decedent's property, then neither the attorney, nor the personal representative, nor anyone else can be said to bear any relationship to the estate, for legal relations can *Page 731 
exist only between persons, and not between persons and things. A man stands in legal relationship to other men with reference to things, but he cannot properly be said to occupy any legal relationship toward those things themselves. It therefore seems utterly immaterial whether the attorney does or does not bear any relationship to the estate.
It is true that the personal representative selects and retains his attorney, and the latter probably looks primarily to his employer for his compensation. There can be no doubt that the executor or administrator is personally liable to his attorney for all services rendered, whether properly chargeable against the estate or not. If the personal representative so chooses, he may pay his attorney any sum he wishes and then ask to be credited accordingly in rendering his final account; or he may delay payment until such accounting is made and then request an allowance to himself for compensation to his attorney. But if instead of following either of those courses he waits and moves the court on final accounting for an order allowing a fee to his attorney, we see no reason why that allowance should not be made directly to the attorney. Indeed, that would seem the sensible thing to do. See In re Vaughn's Estate, 149 Wn. 291,270 P. 1030, where this appears to have been done.
The rule just announced in no way affects another rule laid down in our decisions to the effect that the attorney for an executor under a nonintervention will may not take the matter of fixing his attorney's fees into the probate court. In reMegrath's Estate, 142 Wn. 324, 253 P. 455, affirmed on rehearing, 256 P. 503; In re Peabody's Estate, 169 Wn. 65,13 P.2d 431; Jones v. Peabody, 182 Wn. 148,45 P.2d 915, 100 A.L.R. 64. This is an entirely distinct problem, determined by the provisions of our statute with *Page 732 
reference to nonintervention wills. We do not now decide whether, in cases not involving nonintervention wills, the attorney for the personal representative is under a similar disability as regards initiating court action for the allowance of his fee.
[22] Appellants, in their turn, have also cited In reSullivan's Estate, supra, as holding that, where an administrator has paid an excessive fee to his attorney out of the assets of the estate, the court will not order the attorney to return such money, but will require the administrator to reimburse the estate, leaving the administrator and the attorney to adjust the amount of the latter's fee between them. This may have been a correct rule prior to the enactment of our present statute (See 2 Bancroft, Probate Practice, 831, § 444, and 21 Am.Jur. 694, Executors and Administrators, § 558), although it seems rather formalistic; but, in view of the construction which we have herein placed on Rem. Rev. Stat., § 1528, we conclude that, where an allowance has been made directly to the attorney, as was done in the case of the fee allowed in 1931, the court can order the attorney to return any portion of such fee later found to have been excessive. However, if the personal representative seeks the allowance of an excessive fee, he will, of course, be secondarily liable to the estate in case the attorney fails to make full reimbursement.
[23] The final matter remaining to be considered is one to which a great part of the difficulties of this estate may be attributed. Mr. McKnight has always contended, and still contends, that L.A. Peterson, as the sole heir of Lars Peterson, did not stand on the plane of an ordinary administrator whose sole interest in the property of the estate derived from his appointment as administrator. We have already expressed disapproval of this view, in National Bank *Page 733 of Commerce v. Peterson, supra, and we now specifically hold that L.A. Peterson's status as sole heir of his father's estate did not in any way relieve him of the full responsibilities of an administrator of the estate of a decedent. It is true that he did not derive his sole interest in the estate from his appointment as administrator, but that appointment did determine the measure of his duties. The personal representative of a decedent occupies a dual position: He stands in a fiduciary relationship to the creditors and heirs of the deceased, and at the same time he has obligations as an officer of the court which appointed him.
Peterson promptly paid his father's creditors, and, since he was the sole heir, his responsibility in the first of these capacities was satisfactorily discharged. But he failed entirely to fulfill his further obligation to the court to wind up the affairs of the estate promptly so as to enable the court, in turn, to distribute the estate and discharge its responsibility for the proper devolution thereof. Peterson seems to have felt, in accordance with the position now taken by his attorney, that once he had paid the claims of his father's creditors he was under no further duty to administer the estate properly, or at all, but was thenceforth free to treat the property as his own in every way. This attitude, together with the failure of the court at earlier stages of the administration to maintain stricter control over him, accounts for the subsequent history and the present condition of the estate. It is true that because he was the sole heir his misappropriations do not assume criminal proportions, but that does not mitigate the fact that he wrongfully attempted to treat the property of the estate as his own, and at the same time took advantage of the fact that the estate was still in probate as a means of evading the claims of his own personal creditors. Such conduct not only violated *Page 734 
all sound principles of probate law, but also amounted to a patent fraud upon his creditors.
[24] Mr. McKnight bases his claim of special privileges for his client upon the statutory rule set forth in Rem. Rev. Stat., § 1366 [P.C. § 9863], to the effect that the title to a decedent's real property vests in his heirs immediately on his death, and upon the case of Thatcher v. Capeca, 75 Wn. 249,134 P. 923.
We do not deny that, upon the death of Lars Peterson, thetitle to the real property comprising the bulk of his estate vested in his son, L.A. Peterson. But until he should complete the administration of the estate, his only right to possession of the real property and to the rents and profits therefrom derived from his appointment as administrator. Rem. Rev. Stat., § 1464 [P.C. § 9969]; Gibson v. Slater, 42 Wn. 347, 84 P. 648;Bishop v. Locke, 92 Wn. 90, 158 P. 997; Wendler v.Woodard, 93 Wn. 684, 161 P. 1043. Only after an estate has been closed can the heirs, by acquiring these additional rights in the property, become entitled to treat it as their own.
The Capeca case merely held that where a woman died intestate leaving an estate consisting of property held in common with her husband, who was appointed administrator of her estate, the latter, after paying the community debts and the expenses of administration of his wife's estate, could effect a segregation of the half of the community property belonging to him in his own right, without a decree of distribution, by a mere agreement with the other heirs of his wife. That rule has no application here, because L.A. Peterson's misappropriations all took place while the expenses of administration were still unpaid, and for that reason he was never in a position to claim full right and title to the real property left by his father, *Page 735 
and never held it except in his capacity as administrator.
[25] Furthermore, if he had prolonged the administration of the estate after paying all the debts of the estate and all the expenses of its administration, so as to bring himself within the rule of the Capeca case and entitle him to treat the real estate as his own without a decree of distribution, that property would immediately have become liable for his personal debts as fully as though distributed to him by a decree of court. There is no theory under which one who is at the same time the sole heir of the decedent and the adminitrator of his estate can claim to treat the property of the estate as his own, without likewise subjecting it to liability for his own individual debts. Despite his favored position as sole heir, L.A. Peterson violated his duty as administrator by misappropriating funds of the estate and by unduly prolonging the process of administration. He could not claim, nor can McKnight claim for him, the privilege of treating the property as his own without at the same time admitting its availability to satisfy the claims of his own creditors.
Upon the record as it appears before us, the judgment of the trial court is affirmed, both on the appeal and on the cross-appeal.
ROBINSON, C.J., MAIN, MILLARD, and DRIVER, JJ., concur. *Page 736